C. Moze Cowper (Bar No. 326614)
mcowper@cowperlaw.com
**COWPER LAW PC**
12301 Wilshire Blvd. Suite 303
Los Angeles, California 90025
Telephone: 877-529-3707

Edward Fisher*
efisher@pulf.com
**PROVOST ✫ UMPHREY LAW FIRM**
State Bar No.: 24012624
350 Pine Street, Suite 1100
Beaumont, Texas 77701
Telephone: (409) 838-8813

Patrick Barrett (BPR # 020394)*
pbarrett@pulf.com
**PROVOST ✫ UMPHREY LAW FIRM**
9990 Southwest 77 Avenue, PH 12
4205 Hillsboro Pike, Suite 303
Nashville, Tennessee 37215
Telephone: 615-297-1932

(* *pro hac vice* motions to be filed)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| JANE DOE (A.M.L.), | Case No.:   23-cv-1554 |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| WYNDHAM HOTELS AND RESORTS; PATSIKO, INC.; and SUNSTONE ANAHEIM OWNER, LLC., | |
| Defendants. | |

## PLAINITFF'S ORIGINAL COMPLAINT FOR VIOLATION OF TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT

Jane Doe A.M.L., Plaintiff in the above-styled and numbered cause, files this Original Complaint against Wyndham Hotels and Resorts, Patsiko, Inc., and Sunstone Anaheim Owner, LLC, as Defendants and respectfully shows the Court as follows:

### SUMMARY

1.      Jane Doe A.M.L. files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act through force, fraud, or coercion.[1] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel victims to engage in commercial sex acts against their will.

3.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

1

by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

4.    Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

5.    In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

6.    Jane Doe A.M.L. alleges that Defendants derived financial benefit from facilitating sex trafficking by providing a venue where traffickers could exploit victims, including Jane Doe A.M.L., with minimal risk of detection or interruption. Jane Doe A.M.L. further alleges that Defendants continued providing support for traffickers, including her own trafficker, despite obvious and apparent signs of sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

7.    Defendants had the knowledge and opportunity to prevent the severe and permanent harm that Jane Doe A.M.L. experienced as the result of continuous

sexual exploitation. Defendants failed to do so. Instead, Defendants benefited from facilitating that sex trafficking.  Accordingly, Jane Doe A.M.L. files this lawsuit.

## **PARTIES**

8.     Plaintiff, Jane Doe A.M.L. is a resident of Maricopa, Arizona. She may be contacted through her lead counsel, whose information is contained below.

9.     Jane Doe A.M.L. is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of being caused, through force fraud or coercion, to commit a commercial sex act.

10.    The trafficking of Jane Doe A.M.L. occurred in or affected interstate commerce.

11.    Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe A.M.L.

12.    Wyndham Hotels and Resorts is a for-profit Delaware corporation with its principal place of business in New Jersey.  At all relevant times, Wyndham Hotels and Resorts owned, operated, and controlled the Days Inn by Wyndham Anaheim West, 1030 W. Ball Road, Anaheim, CA 92802.

13.    All references to Wyndham Hotels and Resorts include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic,

foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Wyndham Hotels and Resorts now or at any time relevant to the claims herein.

14.    Wyndham Hotels and Resorts may be served through its registered agent for service: Corporate Creations Network, Inc., 3411 Silverside Road Tatnall Building – Suite No. 104, Wilmington, Delaware 19810.

15.    Patsiko, Inc. is a California corporation with its principal place of business at 201 Deodar Lane, Bradbury, CA 91010.  At all relevant times, Patsiko, Inc. owned, operated, and controlled the Days Inn by Wyndham Anaheim West located at 1030 W. Ball Road, Anaheim, CA 92802.

16.    All references to Patsiko, Inc. include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Patsiko, Inc. now or at any time relevant to the claims herein.

17.    Patsiko, Inc. may be served through its registered agent for service,  Hiren S. Patel, 2879 Watercourse Drive, Diamond Bar, CA 91765.

18.     Sunstone Anaheim Owner, LLC, is a domestic corporation with its principal place of business at 20 Enterprise, Suite 400, Aliso Viejo, CA 92656. At all relevant times, Sunstone Anaheim Owner, LLC  owned, operated, and controlled the Days Inn by Wyndham Anaheim West located at 1030 W. Ball Road, Anaheim, CA 92802.

19.     All references to Sunstone Anaheim Owner, LLC include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Sunstone Anaheim Owner, LLC now or at any time relevant to the claims herein.

20.     Sunstone Anaheim Owner, LLC may be served with process through its registered agent for service, Incorp Services, Inc., 5716 Corsa Ave., Suite 110, Westlake Village, CA 91362.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

22.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District and Division.

23.     Jane Doe A.M.L. was trafficked in this District.

## STATEMENT OF FACTS

24.     On or about August 21, 2013, through August 24, 2013, Jane Doe A.M.L. was unlawfully trafficked at the Days Inn by Wyndham Anaheim West located at 1030 W. Ball Road, Anaheim, CA 92802 ("Days Inn").

25.     Jane Doe's sexual exploitation occurred repeatedly in rooms of the Days Inn.

26.     At all relevant times, the Days Inn was a hotel branded by Wyndham Hotels and Resorts.

27.     At relevant times, Patsiko, Inc., and Sunstone Anaheim Owner, LLC owned, operated, and managed the Days Inn and employed the staff at the Days Inn through the franchising system of Wyndham Hotels and Resorts.

28.     At all relevant times, Wyndham Hotels and Resorts was directly involved in the relevant operations of the Days Inn and exercised systemic control over Patsiko, Inc., and Sunstone Anaheim Owner, LLC with respect to operation of the Days Inn such that Patsiko, Inc., and Sunstone Anaheim Owner, LLC were

Wyndham Hotels and Resorts' actual agents for operation of the Days Inn. Wyndham Hotels and Resorts also retained control over aspects of the operations of the Days Inn directly related to the claims of Jane Doe A.M.L.

29.    The traffickers of Jane Doe A.M.L. and other sex traffickers frequently used Days Inn for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of Days Inn.

30.    There were obvious signs that Jane Doe A.M.L. was being trafficked at Days Inn such that Wyndham Hotels and Resorts, Patsiko, Inc., and Sunstone Anaheim Owner, LLC knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

31.    Some of the obvious signs of Jane Doe A.M.L.'s trafficking at the Days Inn included the fact that hotel rooms would be paid for in cash or prepaid card, she would not leave the room, she would be in the hotel with a group of girls and an older female/male, she had few or no personal items, the car used to transport her there would be parked in a spot where the license plate was not visible, the do not disturb sign was constantly on the door to the room being used and there was a constant heavy foot traffic in and out of her room involving men who were

not hotel guests.  These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

32.    Additionally, hotel staff at the Days Inn interacted directly with the traffickers.  Hotel staff came to the room, looked in the room and saw evidence of prostitution and drug use, including condoms, lubricant, and illegal drugs.

33.    The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Defendants knew or should have known regarding the trafficking of Jane Doe A.M.L. at the Days Inn.

34.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[2] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[3] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4] Hotels have been found to account for over 90 percent of commercial exploitation of children.[5]

---

[2] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id*

[3] *See Human Trafficking in the Hotel Industry*, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[4] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[5] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

35.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[6]

36.     Widely recognized signs of sex trafficking, which can be observed by hotel staff and which Defendants were made of aware of, include but are not limited to:

a.  Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

b.  Individuals show signs of physical abuse, restraint, and/or confinement;

c.  Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d.  Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e.  Individuals lack freedom of movement or are constantly monitored;

f.  Individuals avoid eye contact and interaction with others;

g.  Individuals have no control over or possession of money or ID;

h.  Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

---

[6] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

i.   Individuals have few or no personal items—such as no luggage or other bags;

j.   Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

k.   A group of girls appears to be traveling with an older female or male;

l.   A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m.  Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n.   Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.   Possession or use of multiple cell phones; and

p.   Possession or use of large amounts of cash or pre-paid cards.[7]

37.    Defendants were aware or should have been aware of these signs of sex trafficking when operating controlling, and managing the Days Inn, when enacting and enforcing policies and procedures applicable to that hotel, and when training, educating, and supervising the staff of that hotel.

38.    Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking reasonable

[7] *Id.*

10

steps to identify and prevent trafficking in its hotels is a decision to financially benefit by supporting and facilitating unlawful sex trafficking.

39.     Accordingly, many hotel chains—including Wyndham—have told the public that they have assumed the duty and responsibility to stop sex trafficking in their hotels.

40.     Unfortunately for Jane Doe A.M.L., Wyndham's promises proved empty. Wyndam has have failed, at all levels, to take appropriate action in response to its knowledge regarding human trafficking in its hotels. Instead, Wyndham has continued financially benefiting from providing a venue for the sexual exploitation of victims like Jane Doe A.M.L.

41.     Defendants' actual knowledge is not limited to general awareness of the problem of sex trafficking in the hotel industry. Wyndham has also known, since well before Jane Doe A.M.L. was trafficked at the Days Inn, that sex trafficking is endemic in their branded hotels specifically.

42.     Upon information and belief, Wyndham has monitored criminal activity occurring at its branded hotels and was aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the Days Inn.

43.     Countless tales of tragedy, which upon information and belief Wyndham knows about, establish the entrenched and pervasive nature of Wyndham's role in providing a venue where sex trafficking has continued, unabated, for years. For example, reviews of its branded properties, which upon information and belief Wyndham monitors regularly, also show the pervasiveness of sex trafficking at its branded properties and Wyndham's knowledge of the same.

44.     Upon information and belief, news stories and reviews establish that, at the time Jane Doe A.M.L. was trafficked at the Days Inn, Wyndham knew at least the following:

    a. The use of its branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

    b. Commercial sex work occurring at its branded properties involved trafficking and compelled prostitution;

    c. Its franchisees and hotel staff were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at its hotel properties;

    d. Its efforts, if any, to stop facilitating sex trafficking in its branded properties were not effective; and

    e. It was, by its acts and omissions, facilitating sex trafficking at its branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

45.     Despite the continually mounting evidence that sex trafficking at its properties was ongoing and growing, Wyndham did not change its course.

12

Wyndham chose to continue earning revenue and profits from renting out space in its hotels as a venue for trafficking.

46.     Wyndham, Patsiko, Inc., and Sunstone Anaheim Owner, LLC were also specifically aware that sex trafficking was prevalent at the Days Inn.

47.     Wyndham, Patsiko, Inc., and Sunstone Anaheim Owner, LLC knew that the Days Inn was in a high-crime area with a known history of reports of sex trafficking.

48.     Online reviews of Defendants' hotel, which upon information and belief were monitored by Wyndham, Patsiko, Inc., and Sunstone Anaheim Owner, LLC, establish the nature of the role the Days Inn serves as a venue for sex trafficking.

49.     Defendants also knew or should have known about the sex trafficking pervasive at the Days Inn based on first-hand observations. This activity was continuous and obvious. Hotel staff observed this activity, and, upon information and belief,   Defendants observed this activity through on-site employees, surveillance footage and/or during inspections of the hotel property. Apparent indicia of sex trafficking at the Days Inn included:

    a.  There was a population of traffickers who were known to hotel staff. Communication between the hotel staff and traffickers was friendly and reflected an informal agreement or understanding;

13

b. There was a frequent flow of males, who were not guests of the hotel, in and out of rooms after brief stays;

c. There was a population of regular traffickers who were known to the staff and who routinely made specific requests, such as requesting rooms next to exit doors, requesting adjoining rooms with those being sexually exploited, and requesting to be in the same area of the hotel as other traffickers;

d. Rooms used by the traffickers were regularly observed to be messy, to contain excessive sex and drug paraphernalia, and to have an unclean smell; and

e. The trafficking victims had visible tattoos that indicated "branding" by their traffickers.

50.   The traffickers, including Jane Doe A.M.L.'s trafficker, operated with little regard for concealment, due to an implicit understanding between the hotel staff of the Days Inn and the traffickers. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

51.   The open and apparent nature of this trafficking activity is confirmed by the fact that multiple guests noticed the activity and made reports or complaints about the activity. Defendants failed to take reasonable steps in response to these reports or complaints.

52.   During the time that Jane Doe A.M.L. was trafficked at the Days Inn, it was obvious and apparent she was the victim of sex trafficking.

14

53.     Because it was known among the community of traffickers that staff at the Days Inn turned a blind eye to sex trafficking, Jane Doe A.M.L.'s trafficker made little or no effort to disguise his role or his actions.

54.     During interactions with the front desk staff at the Days Inn, Jane Doe A.M.L. and her trafficker exhibited obvious and apparent signs of trafficking, including:

> a. Jane Doe A.M.L. did not have access to her identification card, which was controlled by her trafficker.
>
> b. Jane Doe A.M.L.'s trafficker would pay for rooms with cash or prepaid cards.
>
> c. Jane Doe A.M.L.'s trafficker smoked marijuana throughout the stay and the odor was obvious to hotel staff.
>
> d. Jane Doe A.M.L.'s trafficker parked his silver Range Rover in the parking lot, where he frequently hung out.
>
> e. Jane Doe A.M.L.'s trafficker played loud music to camouflage loud noises coming from the rooms where the trafficking took place.  This music also concealed the loud sounds resulting from physical abuse as her trafficker enforced his control through violence.   Defendants took no action to investigate the source of the noise or to prevent it from occurring.
>
> f. Jane Doe A.M.L. and her traffickers would arrive and book a room with little or no luggage with them.

55.     While in the common areas of the hotel, Jane Doe A.M.L. exhibited obvious and apparent signs of trafficking that were observed by hotel staff, including:

> a. Jane Doe A.M.L. had limited access to clothing and would be forced to wear clothing that was tattered, inappropriate for the

weather, sexually suggestive, and inappropriate for her and age the circumstances;

b. Jane Doe A.M.L. appeared malnourished and sleep deprived;

c. Jane Doe A.M.L. had visible bruises;

d. Jane Doe A.M.L.'s demeanor showed obvious signs of fear and anxiety;

e. Jane Doe A.M.L., who was kept in a drugged state by her traffickers, exhibited obvious signs of disorientation and impairment.

f. Jane Doe A.M.L. was frequently yelled at by her trafficker in a way that could be heard by customers and staff;

g. Jane Doe A.M.L.'s trafficker was violent with Jane Doe A.M.L. in public areas of the hotel and on the property surrounding the hotel.

h. Hotel staff saw or heard specific incidents of physical abuse; and

i. Staff received specific complaints or reports about Jane Doe A.M.L.'s trafficker.

56.    Hotel staff observed open and apparent signs of activity directly related to the trafficking of Jane Doe A.M.L.:

a. There was constant and heavy foot traffic in and out of Jane Doe A.M.L.'s room involving men who were not hotel guests. Jane Doe A.M.L. had multiple men per day sexually exploiting her at the Days Inn;

b. Men sexually exploiting Jane Doe A.M.L. entered and left her room at unusual times and stayed for brief periods;

c. Jane Doe A.M.L.'s trafficker would often wait in the hallway or visibly pace the parking lot while Jane Doe A.M.L. was engaged in commercial sex work;

d. Men visiting to sexually exploit Jane Doe A.M.L. would enter and exit the hotel in a manner such that they would be seen by staff working at the front desk; and

e. Men visiting to sexually exploit Jane Doe A.M.L.would enter and exit the hotel in a manner such that they would be captured by Defendants' surveillance cameras.

57.    Hotel staff observed Jane Doe A.M.L.'s room, which showed obvious and apparent signs of sex trafficking:

a. Jane Doe A.M.L.'s traffickers would decline room service for several consecutive days;

b. Jane Does A.M.L.' traffickers would order or require Jane Doe A.M.L. to order excessive additional towels and sheets at varying times of the day or night;

c. Staff would hear sounds of abuse, physical violence, screaming, and crying coming from Jane Doe A.M.L.'s room;

d. Despite loud noise coming from Jane Doe A.M.L.'s room, the staff did not  complain about the noise, inquire about the noise or Jane Doe A.M.L.'s wellbeing , or ask Jane Doe A.M.L.'s trafficker to leave;

e. Jane Doe A.M.L. would be confined to her room for excessively long periods without leaving and would have "Do Not Disturb" signs on her door an unusual amount;

f. Hotel staff would enter Jane Doe A.M.L.'s room to find it littered with used condoms and other sex paraphernalia left behind; and

g. Jane Doe A.M.L.'s traffickers would leave obvious signs of illegal drug use in the room for hotel staff to find.

58.    Multiple employees at the Days Inn, including management level employees, observed and/or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

59.    Wyndham is responsible for the acts and omission of all employees of the Days Inn because these acts and omissions were committed in the scope and course of employment, because it ratified these acts and omissions,  and because

Patsiko, Inc., and Sunstone Anaheim Owner, LLC failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the risks, known to them, of human trafficking occurring in the Days Inn.

60.     Patsiko, Inc., and Sunstone Anaheim Owner, LLC, including through the staff at the Days Inn, had an opportunity to and did observe obvious signs that there was widespread sex trafficking in the Days Inn and, despite this, allowed this activity to continue unabated.

61.     Patsiko, Inc., and Sunstone Anaheim Owner, LLC, including through the staff at the Days Inn, had an opportunity to and did observe obvious signs that Jane Doe A.M.L. was being sex trafficked such that Patsiko, Inc., and Sunstone Anaheim Owner, LLC had actual knowledge or was reckless in not knowing that Jane Doe A.M.L. was being sex trafficked at the Days Inn.  Nonetheless, Patsiko, Inc., and Sunstone Anaheim Owner, LLC took no steps in response to these signs and, instead, continued providing assistance to her traffickers.

62.     Patsiko, Inc., and Sunstone Anaheim Owner, LLC facilitated Jane Doe A.M.L.'s trafficking at the Days Inn through numerous acts and omission, including:

> a. Patsiko, Inc., and Sunstone Anaheim Owner, LLC failed to report known or suspected trafficking activity appropriately according to reasonable practices, industry standards, and/or applicable policies;

b. Despite seeing obvious signs of distress, Patsiko, Inc., and Sunstone Anaheim Owner, LLC failed to take any steps to inquire about the welfare of Jane Doe A.M.L.

c. Patsiko, Inc., and Sunstone Anaheim Owner, LLC continued to rent rooms to traffickers, including Jane Doe A.M.L.'s traffickers, despite known or obvious signs of trafficking;

d. Patsiko, Inc., and Sunstone Anaheim Owner, LLC failed to take reasonable steps to hire, train and supervise staff to properly detect and respond to sex trafficking at the Days Inn;

e. Patsiko, Inc., and Sunstone Anaheim Owner, LLC enabled traffickers to access ancillary services that supported trafficking activities, such as providing Wi-Fi access they used to advertise commercial sex services, furnishing an unusually large number of sheets and towels to facilitate the commercial sex acts, and providing disproportionate housekeeping services necessary to clean up the paraphernalia left after the transactions related to commercial sex; and

f. Patsiko, Inc., and Sunstone Anaheim Owner, LLC accommodated specific requests of the traffickers.

63.    By ignoring or remaining willfully blind to obvious signs of trafficking, Patsiko, Inc., and Sunstone Anaheim Owner, LLC assisted traffickers by providing them a venue, with the cover of a legitimate business, where they could conduct their trafficking activities without having to expend significant efforts to avoid detection or interference.

64.    Wyndham retained control over the details and methods of aspects of the operation of the Days Inn that are directly relevant to the proliferation of sex trafficking at that property. As a result of this retained control and its direct involvement, Wyndham participated in a venture with sex traffickers who were using the Days Inn as a venue for their trafficking. Moreover, as a result of this

retained control, Wyndham had both the opportunity and the duty to prevent Jane Doe A.M.L.'s trafficking.

65.     Wyndham retained control over the training of the staff of the Days Inn regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If Wyndham had exercised reasonable diligence in providing training, Wyndham would have prevented the Days Inn from being used to facilitate obvious and apparent sex trafficking, including the trafficking of Jane Doe A.M.L. By failing to take reasonable steps to provide appropriate training, despite the overwhelming evidence it had of an ongoing problem with use of its branded properties for sex trafficking, Wyndham negligently facilitated sex trafficking.

66.     Beyond training, Wyndham also retained control over the response of its hotels to human trafficking, including development of policies and procedure regarding detection of and response to human trafficking. By retaining control in this area, Wyndham assumed a legal duty to the patrons and guests of its hotels. By failing to exercise reasonable diligence in discharge of this duty, Wyndham facilitated sex trafficking, including the sex trafficking of Jane Doe A.M.L. in  its hotels.

67.     At the heart of Defendants' venture with traffickers (including Jane Doe A.M.L.'s traffickers) is the reservation of hotel rooms. Upon information and belief, Wyndham retained control over the details of reservations at the Days Inn, including controlling the online reservation system that Resorts, Patsiko, Inc., and Sunstone Anaheim Owner, LLC, were required to use, providing software systems Resorts, Patsiko, Inc., and Sunstone Anaheim Owner, LLC, had to use  to check guests in and charge for rooms, controlling the prices of rooms, setting all details of the customer loyalty program that  Resorts, Patsiko, Inc., and Sunstone Anaheim Owner, LLC, were required to implement, and setting detailed policies for things such as payment methods and requirements to show identification. Because reservations and payments were processed through its systems, Wyndham had access to guest and payment information. Wyndham thus directly participated, through its acts and omissions, in reserving rooms to traffickers, including Jane Doe A.M.L.'s traffickers. If Wyndham had used reasonable diligence in setting, implementing, and enforcing appropriate policies, it would have detected Jane Doe A.M.L.'s trafficking and/or prevented Jane Doe A.M.L.'s trafficker from using a room to sexually exploit Jane Doe A.M.L. By failing to exercise reasonable diligence in discharge of this duty, Wyndham facilitated sex trafficking, including the sex trafficking of Jane Doe A.M.L., in their hotels.

68.     Specifically, Wyndham should have known about and prevented Jane Doe A.M.L.'s trafficking because Wyndham failed to adopt and enforce appropriate identification policies and payment-method policies to prohibit use of its hotel properties for trafficking. Wyndham retained the control to adopt and enforce policies on this subject for its branded properties, including the Days Inn, but failed to adopt and enforce appropriate policies, which facilitated trafficking at the Days Inn and allowed Jane Doe A.M.L.'s traffickers to access rooms for the purpose of trafficking Jane Doe A.M.L.

69.     Wyndham also retained control over issues related to reporting security and criminal activity, including human trafficking activity. On information and belief, Wyndham adopted a policy that required staff at the Days Inn to report indicators or potential criminal activity on premises to Wyndham. Based on Wyndham's retained control over this area, it knew or—with reasonable diligence in implementing and enforcing this policy—should have known that Jane Doe A.M.L. was being trafficked. By failing to exercise reasonable diligence in discharge of this duty, Wyndham facilitated sex trafficking, including the sex trafficking of Jane Doe, at the Days Inn.

70.     On information and belief, Wyndham also retained control over property-specific data and customer data from the Days Inn—which they obtained by controlling the means and methods by which Patsiko, Inc., and Sunstone

Anaheim Owner, LLC, recorded, stored, and reported that data—such that they had actual or constructive knowledge—about the ongoing trafficking that was occurring at the Days Inn during the time Plaintiff was trafficked there. However, on information and belief, Wyndham was willfully blind to this data and continued to facilitate trafficking at the Days Inn by providing a venue— and associated services—where traffickers could profit from sexual exploitation with minimal risk of disruption.

71. Wyndham also retained control over the security of the Days Inn through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing customer complaints, and inspecting the Days Inn. It also collected data regarding hotel operations and customers, including names, payment information, reservation history, browsing data, and other details associated with their stay. Because Wyndham retained this control, it had a duty to the patrons and visitors to the Days Inn. If Wyndham had exercised reasonable care in the discharge of this duty, it would have detected and known about Jane Doe A.M.L.'s trafficking- and avoided facilitating it. By failing to exercise reasonable diligence in discharge of this duty, Wyndham facilitated sex trafficking, including the sex trafficking of Jane Doe A.M.L., in its hotel.

72.     Wyndham also retained control over the safety and security of the experience at its branded properties by setting up systems for customers to report issues to Wyndham rather than Patsiko, Inc., and Sunstone Anaheim Owner, LLC. Despite doing this, Wyndham failed to act reasonably in response to complaints about criminal activity and sex trafficking at its properties, including the Days Inn. If Wyndham had acted reasonably and prudently in monitoring and responding to customer complaints, this would have reduced the rampant sex trafficking in its branded properties and would not have facilitated Jane Doe A.M.L.'s sex trafficking.

73.     Wyndham required Patsiko, Inc., and Sunstone Anaheim Owner, LLC to offer internet service to guests at the Days Inn and retained control over the details of that internet service and policies regarding its use. Upon information and belief, Wyndham required Patsiko, Inc., and Sunstone Anaheim Owner, LLC to use a particular platform, set policies, and retained access to data regarding guests' use of wi-fi. Wyndham was aware that sex traffickers used the internet to facilitate trafficking by advertising victims' commercial sex services. Because Wyndham retained control over internet service, it could have but did not enact policies to prevent Jane Doe A.M.L.'s traffickers from advertising commercial sex activity online and could have, with reasonable diligence, used

tools to determine when their hotel and wi-fi were being used to facilitate unlawful sexual exploitation.

74.    Based on public reporting, investigations, criminal incidents, hotel reviews and comments, and direct reporting from Patsiko, Inc., and Sunstone Anaheim Owner, LLC, as set out throughout this Complaint, Wyndham had actual knowledge of pervasive sex trafficking throughout its owned hotel properties generally and specifically at the Days Inn. Wyndham, through its acts and omissions, knowingly received financial benefit from activity at its branded hotels, including the Days Inn, that Wyndham knew or should have known was unlawful sex trafficking.

75.    If Wyndham had acted reasonably, in compliance with industry standard, in compliance with its own promises, and/or in compliance with its own policies and procedures, Jane Doe A.M.L.'s trafficking would have been prevented.

76.    In addition to Wyndham's direct involvement in the venture through the means outlined above, Wyndham also participated in the venture through the acts and omissions of Patsiko, Inc., and Sunstone Anaheim Owner, LLC, which are Wyndham's actual agents for the purpose of operating the Days Inn.

77.    Upon information and belief, Wyndham exercised systemic and pervasive control over Patsiko, Inc., and Sunstone Anaheim Owner, LLC's day-to-day

operation of the Days Inn, including the methods and details of  Patsiko, Inc.'s, and Sunstone Anaheim Owner, LLC's work, through ways including:

a. Controlling and requiring franchisees to use a reservation and marketing system;

b. Controlling and requiring franchisees to use a credit process system;

c. Dictating policies regarding forms of payment;

d. Setting prices;

e. Setting wages;

f. Making or influencing employment decisions;

g. Requiring standardized training for hotel employees;

h. Requiring franchisees to collect guest data using Wyndham' systems, to compile reports, and to make that data available to Wyndham; and

i. Requiring Patsiko, Inc., and Sunstone Anaheim Owner, LLC  to comply with standards, policies, and rules adopted by Wyndham on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, or other hotel brand related policies published and communicated via property management systems, Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Days Inn.

78.     Wyndham did not merely identify quality or outcome standards. Instead, it specifically directed the means and methods that Patsiko, Inc., and Sunstone Anaheim Owner, LLC  and the staff at the Days Inn should use for day-to-day operations and dictated many of the core tools that Patsiko, Inc., and Sunstone Anaheim Owner, LLC  were required to use to conduct those operations,

including the means and methods of operations that directly caused Jane Doe A.M.L.'s damages.

79.     Upon information and belief, Wyndham  had the right to and actually did enforce their control over Patsiko, Inc., and Sunstone Anaheim Owner, LLC through various methods including:

    a.  Inspections of the Days Inn;

    b.  Monitoring or auditing Patsiko, Inc., and Sunstone Anaheim Owner, LLC  for compliance with policies and expectations;

    c.  Directing Patsiko, Inc., and Sunstone Anaheim Owner, LLC to take specific steps to come into compliance with detailed and exacting standards;

    d.  Mandating training and education; and

    e.  Maintaining the right to terminate the franchise agreement.

80.     Wyndham is vicariously liable for the acts and omissions of its agents, Patsiko, Inc., and Sunstone Anaheim Owner, LLC , and any sub-agents or employees of Patsiko, Inc., and Sunstone Anaheim Owner, LLC with respect to operation of the Days Inn.

81.     In addition, both Wyndham and Patsiko, Inc., and Sunstone Anaheim Owner, LLC participated in the venture through the acts and omissions of the staff at the Days Inn because Wyndham and Patsiko, Inc., and Sunstone Anaheim Owner, LLC jointly employ or ratify the employment of staff at the Days Inn.

82. Upon information and belief, Wyndham exercises control over the terms and conditions of the terms and conditions of employment by:

    a. Posting jobs for its branded properties;

    b. Providing benefits to staff of its branded properties;

    c. Setting pay, pay parameters, or pay ranges for staff of its branded properties;

    d. Setting job qualifications;

    e. Setting job descriptions;

    f. Dictating staffing levels required at its branded properties;

    g. Making or influencing hiring decisions;

    h. Providing onboarding and ongoing training; and

    i. Maintaining employment records, including training records.

83. Wyndham and Patsiko, Inc., and Sunstone Anaheim Owner, LLC act as joint employers because, at the Days Inn, there is a high degree of interrelation of operations and profit sharing.

84. In ways described more fully above, Wyndham and Patsiko, Inc., and Sunstone Anaheim Owner, LLC knowingly received a financial benefit from participating in a venture with sex traffickers, including Jane Doe A.M.L.'s sex traffickers, as follows:

    a. Sex traffickers, including Jane Doe A.M.L.'s sex traffickers, frequently used the Days Inn for their trafficking because they knew that staff members would look the other way. This occurred because Wyndham and Patsiko, Inc., and Sunstone Anaheim Owner, LLC (1) failed to adopt and enact policies to effectively detect sex trafficking and stop use of their facilities to facilitate that trafficking; (2) failed to use reasonable care when hiring, retaining,

supervising, and training staff at the Days Inn; and (3) affirmatively adopted policies and procedures that allowed sex trafficking to flourish.

b. Both Wyndham and Patsiko, Inc., and Sunstone Anaheim Owner, LLC participated in this venture by acting jointly to rent rooms to traffickers. Patsiko, Inc., and Sunstone Anaheim Owner, LLC provided "boots on the ground" for reservations, and Wyndham retained control over reservation systems and applicable policies and guidelines as further described in this Complaint. They participated in the venture by continuing to rent rooms to Jane Doe A.M.L.'s traffickers long after they knew or should have known that Jane Doe A.M.L. was being subjected to unlawful trafficking.

c. Defendants did not only provide these traffickers with a physical space but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low-risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

    i. Jane Doe A.M.L.'s traffickers were familiar to the staff at the Days Inn;

    ii. Jane Doe A.M.L.'s traffickers took no steps to conceal their activities from the staff at the Days Inn but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by that staff;

    iii. Despite policies and/or industry standards to the contrary, Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments, not requiring the identification card of the individual actually paying for the room;

    iv. Both Wyndham and Patsiko, Inc., and Sunstone Anaheim Owner, LLC participated in this venture by providing additional services to traffickers (including Jane Doe A.M.L.'s traffickers), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms; and

     v.  Defendants' venture with traffickers resulted in revenue from room rentals and other incidental purchases by traffickers, including Jane Doe A.M.L.'s trafficker, which accrued to the benefit of both Wyndham and Patsiko, Inc., and Sunstone Anaheim Owner, LLC. Each room rented at the Days Inn increased revenue for both Wyndham and Patsiko, Inc., and Sunstone Anaheim Owner, LLC.

85.    Wyndham also knowingly received a financial benefit by engaging in a venture with Patsiko, Inc., and Sunstone Anaheim Owner, LLC operating the Days Inn despite the fact that Wyndham knew or should have known that Patsiko, Inc., and Sunstone Anaheim Owner, LLC were engaged in violation a of 18 U.S.C §1591(a):

    a.  Wyndham and Patsiko, Inc., and Sunstone Anaheim Owner, LLC entered into a venture to operate the Days Inn with the shared objective of maximizing revenue and profits;

    b.  Wyndham knowingly received a financial benefit from this venture in the form of franchising fees, royalty fees, and other payments from Patsiko, Inc., and Sunstone Anaheim Owner, LLC;

    c.  Patsiko, Inc., and Sunstone Anaheim Owner, LLC violated 18 U.S.C §1591(a)(1) because, through their management of the Days Inn and the acts and omissions of the staff of this hotel, Patsiko, Inc., and Sunstone Anaheim Owner, LLC harbored trafficking victims and participated in a venture with sex traffickers; and

    d.  Wyndham knew, or with the exercise of reasonable diligence, would have known that Patsiko, Inc., and Sunstone Anaheim Owner, LLC were engaged in violations of 18 U.S.C §1591(a). Wyndham should have known about Patsiko, Inc., and Sunstone Anaheim Owner, LLC's activity at the Days Inn because Wyndham retained control over relevant aspects of the operations of the Days Inn and thus owed a corresponding duty. Despite this, Wyndham continued to knowingly benefit from its relationship with Patsiko, Inc., and Sunstone Anaheim Owner, LLC, including

the proceeds Patsiko, Inc., and Sunstone Anaheim Owner, LLC obtained from unlawful sex trafficking. Wyndham continued providing Patsiko, Inc., and Sunstone Anaheim Owner, LLC with operational support, use of its trademarks, and other resources to operate the Days Inn  in a way that Wyndham knew or should have known was engaging in violations of 18 U.S.C §1591(a).

86.    Under the TVPRA, Defendants are jointly and severally liable for all damages a jury awards to Jane Doe A.M.L. for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

**CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA**

87.    Jane Doe A.M.L.  incorporates all previous allegations.

88.    At all relevant times, Jane Doe A.M.L. was and is a victim within the meaning of 18 U.S.C. § 1591 and 1595(a).

89.    Defendants are liable as perpetrators within the meaning of 18 U.S.C. § 1595(a) because in the ways described above, each Defendant knowingly or recklessly participated in harboring, maintenance, and/or other acts in further of sex trafficking, including the sex trafficking of Jane Doe A.M.L.; and each Defendant knowingly benefitted, by receiving financial and other compensation, through their participation in a venture that they knew or were reckless in not knowing involved the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

90.     Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as described above, Defendants knowingly benefitted, by receiving financial and other compensation, from their participation in a venture they knew or should have known was engaged in a violation of the TVPRA, 18 U.S.C. § 1581, et seq.

91.     Despite knowledge of A.M.L.'s sex trafficking by the Defendants, Jane Doe A.M.L.'s trafficker was able to continue renting rooms for the sexual exploitation of Jane Doe A.M.L.  at the Days Inn.

92.     Each Defendant participated in a venture together and with, among others, Jane Doe A.M.L.'s traffickers. Defendants had an ongoing business relationship and association in fact with Jane Doe A.M.L.'s traffickers. Despite the fact that Defendants knew or should have known that Jane Doe A.M.L. was being sex trafficked in violation of the TVPRA, Jane Doe A.M.L.'s traffickers were able to rent rooms for the sexual exploitation of Jane Doe A.M.L. at the Days Inn. Jane Doe A.M.L.'s sex traffickers used the Days Inn because they knew that staff members looked the other way despite obvious signs of trafficking. Each of the venturers shared a common purpose – the rental of hotel rooms and the making of profits. Each Defendant profited while Jane Doe A.M.L.'s trafficker was able to rent a secure venue to earn profits by trafficking Jane Doe A.M.L. Each Defendant participated in the venture by continually renting rooms to Jane

Doe A.M.L.'s trafficker, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of Jane Doe A.M.L.'s trafficking.

93.    Through the acts and omissions described throughout this Complaint, Wyndham received a financial benefit from participating in a venture with Patsiko, Inc., and Sunstone Anaheim Owner, LLC and the staff of the Days Inn even though Wyndham knew or should have known this venture was engaged in a violation of the TVPRA, 18 U.S.C. §§ 1595(a) and 1591(a).

94.    Each Defendant's failure to train and supervise their agents and employees and their inattention to the plights of their patrons, including Jane Doe A.M.L. at the Days Inn, enabled and contributed to the sex trafficking of Jane Doe A.M.L.

95.    Each Defendant received substantial financial benefits as a result of these acts and/or omissions. Wyndham received benefits in the way of management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the Days Inn. Patsiko, Inc., and Sunstone Anaheim Owner, LLC received benefits in the way of room rental fees, in-room purchases, and other ancillary expenses by patrons and visitors of the Days Inn.

96.     The facts alleged establish that each Defendant knowingly benefitted, financially or by receiving anything of value, from participating in a venture that Defendants knew or should have known has engaged in an act in violation of the TVPRA.

97.     The venture or ventures in which each Defendant participated were a direct, producing, and proximate cause of the injuries and damages to Jane Doe A.M.L.

98.     Jane Doe A.M.L. further alleges that, as a result of the relationship between Wyndham and Patsiko, Inc., and Sunstone Anaheim Owner, LLC, Wyndham is vicariously liable for the acts of Patsiko, Inc., and Sunstone Anaheim Owner, LLC, including at the Days Inn.  Factors that support this allegation are that Wyndham shared profits, standardized employee training, standardized and strict rules of operations, and Wyndham controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Finally, Wyndham had the right to terminate any franchisee, including Patsiko, Inc., and Sunstone Anaheim Owner, LLC, that failed to comply with the requirements promulgated by Wyndham. Thus, Wyndham retained control, or the right to control, the mode and manner of work contracted for.

99.     Jane Doe A.M.L. further alleges that Wyndham vicariously liable for the acts and omissions of the staff at the Days Inn because Wyndham, together with Patsiko, Inc., and Sunstone Anaheim Owner, LLC, acted as the joint employer of these employees because Wyndham and Patsiko, Inc., and Sunstone Anaheim Owner, LLC jointly controlled the terms and conditions of their employment.

100.    Wyndham and Patsiko, Inc., and Sunstone Anaheim Owner, LLC acts and omissions, individually and collectively, caused Jane Doe A.M.L. to sustain legal damages.

101.    Wyndham and Patsiko, Inc., and Sunstone Anaheim Owner, LLC are joint and severally liable for all past and future damages sustained by Jane Doe A.M.L.

102.    Jane Doe A.M.L. is entitled to be compensated for personal injuries and economic damages, including:

      a.  Actual damages;

      b.  Direct damages;

      c.  Incidental and consequential damages;

      e.  Mental anguish and emotional distress damages (until trial and in the future);

      f.  Lost earning capacity in the future;

      g.  Loss of self-esteem and self-worth;

      h.  Necessary medical expenses;

      i.  Physical pain and suffering;

j.  Physical impairment;

k.  Emotional impairment;

l.  Unjust enrichment; and

m. Penalties.

103.   Jane Doe A.M.L. is entitled to exemplary damages.

104.   Jane Doe A.M.L. is entitled to treble damages.

105.   Jane Doe A.M.L. is entitled to recover attorneys' fees and costs of court.

106.   Jane Doe A.M.L. is entitled to pre- and post-judgment interest at the maximum legal rates.

107.   A constructive trust should be imposed on Defendants, and the Court should sequester any benefits or money wrongfully received by Defendants for the benefit of Jane Doe A.M.L.

**DISCOVERY RULE**

108.   To the extent Defendants assert an affirmative defense of limitations, Jane Doe A.M.L. invokes the discovery rule. At the time Jane Doe A.M.L. was harmed, Jane Doe A.M.L. did not know that she was the victim of human trafficking, that her injury arose from being trafficked at Defendants' hotel or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, and certainly not more than ten years

before suit was filed. Moreover, at the time the trafficking occurred, Jane Doe A.M.L. did not know what "human trafficking" was, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the existence of a cause of action until shortly before suit was filed, and certainly not more than ten years before suit was filed.

## JURY TRIAL

109.   Jane Doe A.M.L. demands a jury trial on all issues.

## RELIEF SOUGHT

Wherefore, Jane Doe A.M.L. respectfully requests judgment against Wyndham Hotels and Resorts, Patsiko, Inc., and Sunstone Anaheim Owner, LLC, jointly and severally, for actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law, costs of suit, attorney fees, and all other relief, at law or in equity, to which she may be justly entitled.


Dated: August 21, 2023                               Respectfully submitted,

                                        By: /s/ C. Moze Cowper
                                        C. Moze Cowper (Bar No. 326614)
                                        COWPER LAW
                                        12301 Wilshire Blvd. Suite 303
                                        Los Angeles, CA 90025
                                        Telephone: 877-529-3707
                                        mcowper@cowperlaw.com

37

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROVOST ✶ UMPHREY LAW FIRM**
By: <u>/s/ Edward Fisher</u>
Edward Fisher
 State Bar No.: 24012624
 350 Pine Street, Suite 1100
Beaumont, Texas 77701
Telephone: (409) 838-8813
efisher@pulf.com
*To be admitted Pro Hac Vice*


Patrick Barrett (BPR # 020394)
4205 Hillsboro Pike, Suite 303
Nashville, TN 37215
615-297-1932
pbarrett@pulf.com
*To be admitted Pro Hac Vice*

*Counsel for Plaintiff*