C. Moze Cowper (Bar No. 326614)
mcowper@cowperlaw.com
**COWPER LAW PC**
12301 Wilshire Boulevard, Suite 303
Los Angeles, California 90025
Tel.: (877) 529-3707

Patrick Barrett (*pro hac vice*)
pbarrett@pulf.com
**PROVOST UMPHREY LAW FIRM**
4205 Hillsboro Pike, Suite 303
Nashville, Tennessee 37215
Tel.: (615) 297-1932

Edward Fisher (*pro hac vice*)
efisher@pulf.com
**PROVOST UMPHREY LAW FIRM**
350 Pine Street, Suite 1100
Beaumont, Texas 77701
Tel.: (409) 838-8813

*Attorneys for Plaintiff (additional listed on signature page)*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| JANE DOE (A.M.L.), | Case No. 8:23-cv-01554-JVS- JDE |
| Plaintiff, | Hon. James V. Selna |
| vs. | **PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| WYNDHAM HOTELS AND RESORTS; PATSIKO, INC.; SUNSTONE ANAHEIM OWNER, LLC; DAYS INN WORLDWIDE, INC.; and WYNDHAM HOTEL GROUP, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Jane Doe A.M.L., Plaintiff in the above-styled and numbered cause, files this First Amended Complaint against Wyndham Hotels and Resorts, Inc., Days Inn Worldwide, Inc., Wyndham Hotel Group, LLC, Patsiko, Inc., and Sunstone Anaheim Owner, LLC, as Defendants and respectfully shows the Court as follows:

## SUMMARY

1. Jane Doe A.M.L. files this civil lawsuit seeking compensation for the harm she suffered because of the sex trafficking she endured at the Days Inn by Wyndham located at 1030 W. Ball Road, Anaheim, CA 92802. ("Days Inn Anaheim West"), a hotel owned, operated, maintained, and controlled by Defendants.

2. Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

3. Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

4. In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from

1

participation in a venture that they know or should know engages in sex trafficking. *See* William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008. (PUBLIC LAW 110–457—DEC. 23, 2008).

5.     In as recent of January of 2023, Congress continued to recognize the importance of expanding accountability as it relates to sex-trafficking by expanding liability even further to individuals who even attempts or conspires to benefit financially or otherwise from a sex trafficking venture.

6.     As discussed further herein, each Defendant knowingly benefited from providing a venue at the Days Inn Anaheim West where traffickers could exploit victims, including Jane Doe A.M.L., with minimal risk of detection or interruption.

7.     Each Defendant developed a continuous business relationship and implicit agreement with sex traffickers, including Jane Doe A.M.L.'s trafficker, by providing these traffickers with hotel rooms and related services despite apparent "red flags" that alerted Defendants to sex trafficking occurring. Defendants were, therefore, knowingly receiving a benefit from participation in a venture with traffickers that each Defendant knew or should have known was facilitating sex trafficking.

8.     Defendants Wyndham Hotels and Resorts, Days Inn Worldwide, Inc., Wyndham Hotel Group, LLC, (collectively "the Wyndham Brand Defendants") also benefited from maintaining a commercial venture with the franchisees operating the Days Inn Anaheim West: Defendants Patsiko, Inc., and Sunstone Anaheim Owner,

2

LLC. The Wyndham Brand Defendants continued participating in this venture even though they knew or should have known that these franchisees were facilitating widespread trafficking at the hotel, resulting in the trafficking of Jane Doe A.M.L. The Wyndham Brand Defendants were, therefore, knowingly receiving a benefit from participation in a venture with its franchisees that the Wyndham Brand Defendants knew or should have known was involved in sex trafficking.

9.      Defendants had the knowledge, opportunity and duty **to cease benefiting from** the severe and permanent harm that Jane Doe A.M.L. experienced as the result of her continuous sexual exploitation. Defendants failed to do so. Instead, Defendants chose to continue benefiting from the facilitation of sex trafficking.  Accordingly, Jane Doe A.M.L. files this lawsuit under the TVPRA.

**PARTIES**

**I.     Plaintiff**

10.      Plaintiff, Jane Doe A.M.L. is a resident of Maricopa, Arizona. She may be contacted through her lead counsel, whose information is contained below.

11.      Jane Doe A.M.L. is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of being caused, through force fraud or coercion, to commit a commercial sex act.

12.      The trafficking of Jane Doe A.M.L. occurred in or affected interstate commerce.

3

13.    Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe A.M.L.

## II.    The Wyndham Brand Defendants

14.    Wyndham Hotels & Resorts, Inc. ("WHR") is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. Defendant WHR is the successor entity to the hotel business of Wyndham Worldwide Corporation and its former subsidiaries. Defendant WHR is responsible, as successor, for all liabilities of Wyndham Worldwide Corporation and its predecessor subsidiaries related to franchising, controlling, and operating the Days Inn Anaheim West. All references to WHR include the acts and omissions of predecessor entities for which WHR is responsible, including Wyndham Worldwide Corporation and its former subsidiaries.

15.    Wyndham Hotel Group, LLC ("WHG") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, WHG is a wholly owned subsidiary of WHR and a former subsidiary of Wyndham Worldwide Corporation. WHG may be served through its registered agent for service, Sarah Clemens, 5901 W Century Blvd., Los Angeles, CA.

16.    Days Inns Worldwide, Inc. ("DIW") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, DIW is a direct subsidiary of WHG, an indirect subsidiary of WHR, and a former

subsidiary of Wyndham Worldwide Corporation. DIW may be served through its registered agent for service, Sarah Clemens, 5901 W Century Blvd., Los Angeles, CA.

17.   WHR, WHG, and DIW are referred to collectively as the "Wyndham Brand Defendants."

18.   All references to the Wyndham Brand Defendants include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international of any of the Wyndham Brand Defendants or their predecessor entities. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of any of the Wyndham Brand Defendants or its predecessor entities now or at any time relevant to the claims herein.

19.   At all relevant times, the Wyndham Brand Defendants owned, operated, and controlled the Days Inn Anaheim West.

**III.   Franchisee Defendants**

20.   Patsiko, Inc. is a California corporation with its principal place of business at 201 Deodar Lane, Bradbury, CA 91010.  At all relevant times, Patsiko, Inc. owned, operated, and controlled the Days Inn Anaheim West.

21.   All references to Patsiko, Inc. include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with

5

direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Patsiko, Inc. now or at any time relevant to the claims herein.

22.    Patsiko, Inc. may be served through its registered agent for service, Hiren S. Patel, 2879 Watercourse Drive, Diamond Bar, CA 91765.

23.    Sunstone Anaheim Owner, LLC, is a domestic corporation with its principal place of business at 20 Enterprise, Suite 400, Aliso Viejo, CA 92656.  At all relevant times, Sunstone Anaheim Owner, LLC owned, operated, and controlled the Days Inn Anaheim West.

24.    All references to Sunstone Anaheim Owner, LLC include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Sunstone Anaheim Owner, LLC now or at any time relevant to the claims herein.

25.    Sunstone Anaheim Owner, LLC may be served with process through its registered agent for service, Incorp Services, Inc., 5716 Corsa Ave., Suite 110, Westlake Village, CA 91362.

26.    Patsiko, Inc. and Sunstone Anaheim Owner, LLC, are referred to collectively as "Franchisees."

6

**JURISDICTION AND VENUE**

27.    This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

28.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District and Division.

29.    Jane Doe A.M.L. was trafficked at a hotel in this District.

**STATEMENT OF FACTS**

I.    **Jane Doe A.M.L. is a Survivor of Sex Trafficking at a Hotel Owned, Operated, Managed, and Controlled by the Defendants.**

30.    Jane Doe A.M.L. is a survivor of sex trafficking. Jane Doe A.M.L. was forced to engage in commercial sex for her trafficker's financial benefit.

31.    On or about August 21, 2013, through August 24, 2013, Jane Doe A.M.L. was repeatedly trafficked at the Days Inn Anaheim West. Jane Doe A.M.L.'s exploitation occurred repeatedly in the rooms of the Days Inn and was facilitated by all Defendants.

32.    At all relevant times, the Days Inn Anaheim West was a Wyndham brand hotel.

33.    At all relevant times, the Wyndham Brand Defendants adopted a centralized approach to trafficking-related issues at all Wyndham branded properties, including Days Inn properties and the subject location.

34.    At all relevant times, the Wyndham Brand Defendants were directly involved in the relevant operations of the Days Inn and exercised systemic control with respect to operation of the Days Inn Anaheim West such that Franchisees were the Wyndham Brand Defendants actual agents. The Wyndham Brand Defendants also retained control over aspects of the operations of the Days Inn directly related to the claims of Jane Doe A.M.L.

35.    The traffickers of Jane Doe A.M.L. as well as other sex traffickers frequently used the Days Inn Anaheim West for sex trafficking with approval, acquiescence, explicit and/or implicit support of Defendants and their employees and agents, including the staff of Days Inn Anaheim West.

36.    There were obvious signs that Jane Doe A.M.L. and other victims were being trafficked at Days Inn Anaheim West such that Franchisees and the Wyndham Brand Defendants knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

8

37.     Jane Doe A.M.L.'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry.[1] These effects were obvious and apparent to the staff and management of the Days Inn Anaheim West, including effects on Jane Doe A.M.L.'s appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others. Hotel staff and Franchisees had a duty to report these signs to the Wyndham Brand Defendants.

38.     Jane Doe A.M.L.'s trafficking, and the widespread trafficking of other victims, occurred at the Days Inn Anaheim West as a direct result of the policies and practices adopted by the Wyndham Brand Defendants. The Wyndham Brand Defendants knew or should have known that its policies and practices were facilitating widespread sex trafficking at the Days Inn Anaheim West, including the trafficking of Jane Doe A.M.L. Alternatively, if the Wyndham Brand Defendants had exercised ordinary diligence, they would not have benefited from the sex trafficking at the Days Inn Anaheim West, including the trafficking of Jane Doe A.M.L. Thus, constructive knowledge of the trafficking of Jane Doe A.M.L. is imputed to the Wyndham Brand Defendants.

---

[1] *See supra* paragraph 37 and accompanying footnote for discussion of "red flags" of trafficking.

**II.    The Hotel Industry's Role in Sex Trafficking and Hotel Defendants' Knowledge of the Problem.**

39.    The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Defendants knew or should have known regarding the trafficking of Jane Doe A.M.L. at the Days Inn Anaheim West.

40.    Hotels are the primary place where sex trafficking occurs.[2] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[3] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4] Hotels have been found to account for over 90 percent of commercial exploitation of children.[5]

41.    Because of this link between hotels and sex trafficking, government agencies and non-profits, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, and EPCAT, among others, have devoted significant

---

[2] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[3] *See Human Trafficking in the Hotel Industry*, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[4] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf.

[5] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

efforts to intervening and educating the hotel industry, including the Defendants, on best practices for identifying and responding to sex trafficking.[6]

42.    Widely recognized signs of sex trafficking, which can be observed and reported by hotel staff and which Defendants were made of aware of, include but are not limited to:

a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

b. Individuals show signs of physical abuse, restraint, and/or confinement;

c. Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d. Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e. Individuals lack freedom of movement or are constantly monitored;

f. Individuals avoid eye contact and interaction with others;

g. Individuals have no control over or possession of money or ID;

h. Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

i. Individuals have few or no personal items—such as no luggage or other bags;

---

[6] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

11

j.   Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

k.   A group of girls appears to be traveling with an older female or male;

l.   A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m.   Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n.   Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.   Possession or use of multiple cell phones; and

p.   Possession or use of large amounts of cash or pre-paid cards.[7]

43.   The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by properly trained staff.

44.   Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

45.   The United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are actually subject to force, fraud, or coercion.

---

[7] *Id.*

12

46.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex, including signs of prostitution, were in fact signs of sex trafficking.[8]

47.     Defendants were aware or should have been aware of these signs of sex trafficking when operating controlling, and managing the Days Inn Anaheim West, when enacting and enforcing policies and procedures applicable to that hotel, and when training, educating, and supervising the staff of that hotel.

48.     The most effective weapon against sexual exploitation and human trafficking is education and training.[9] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[10]

49.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging

---

[8] *Id.*

[9] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[10] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

13

Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[11] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

50. Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels is a decision to financially benefit by supporting and facilitating unlawful sex trafficking.

51. Accordingly, many hotel chains—including Wyndham branded hotels—have told the public that they have assumed the duty and responsibility to stop sex trafficking in their hotels. For example, the Wyndham Brand Defendants have recognized their "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[12] The Wyndham brand has publicly claimed to be taking steps to avoid sex trafficking in its hotels since at least 2011.[13]

---

[11] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).
[12] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[13] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/

52.    Unfortunately for Jane Doe A.M.L., Defendants' promises have proved empty. While Defendants' statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking and receiving benefits from that trafficking. Emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[14]

53.    The Wyndham Brand Defendants have failed, at all levels, to take appropriate action in response to its knowledge regarding human trafficking in their hotels. Instead, the Wyndham Brand Defendants have continued financially benefiting from providing a venue for the sexual exploitation of victims like Jane Doe A.M.L.

**III.    Sex Trafficking Has Long Been Prevalent at Wyndham Branded Properties, and the Wyndham Brand Defendants Have Known About It.**

54.    Defendants' actual knowledge is not limited to general awareness of the problem of sex trafficking in the hotel industry. The Wyndham Brand Defendants have also known, since well before Jane Doe A.M.L. was trafficked at the Days Inn Anaheim

---

[14] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")

15

West, that sex trafficking is endemic in Days Inn branded hotels specifically, including at the Days Inn Anaheim West.

55.     Upon information and belief, each of the Defendants monitored criminal activity occurring at Days Inn branded hotels, including the Days Inn Anaheim West, and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the Days Inn Anaheim West.

## A. Sex Trafficking at Wyndham Branded Hotels was well Known by Defendants.

56.     The problem of sex trafficking at Wyndham branded properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotels from supporting the sex trafficking of children .[15] Although Wyndham publicly committed to take steps to stop facilitating trafficking, this promise proved empty; the Wyndham brand has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[16]

57.     In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[17]

[15] https://www.change.org/p/stop-wyndham-hotel-staff-from-supporting-child-sex-trafficking-in-wyndham-hotels
[16] https://endsexualexploitation.org/wyndham/
[17] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/

58.     Information that has become public through news stories establishes the entrenched and pervasive nature of the Wyndham Brand Defendants' role in providing a venue where sex trafficking has continued unabated for years. For example:

- In 2010, a man was arrested on human trafficking charges, accused of forcing teens into prostitution at a Days Inn."[18]June 2011, a woman was sentenced to 9 years in prison for the sex trafficking of two 14-year-old girls. The girls were forced to work at the Days Inn in Hartford, Connecticut.[19]

- In 2012, federal officials caught and arrested a man alleged to have trafficked a 14-year-old girl at a Florida Days Inn.[20]

- In 2012, the first successful prosecution of a human trafficking case in Wisconsin occurred after a man trafficking a woman at a Days Inn in Wausau, Wisconsin.[21]

- In October 2012, a woman was arrested for prostitution an Ohio Days Inn. This arrest came after a 2011 prostitution sting operation that netted six arrests.[22]

- A Days Inn owner in Pennsylvania was forced to pay 24 million dollars to teenage victims of sex trafficking who were exploited at the hotel in 2012 and 2013.[23]

---

[18] *Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into   prostitution*, NOLA.com (Jul 20, 2010),
Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution | Crime/Police | nola.com
[19] *East Hartford Woman Sentenced to 9 Years In Prison for Sex Trafficking Of Two 14-Year-Old Girls*, Hartford Courant (June 24, 2011), https://www.courant.com/2011/06/24/east-hartford-woman-sentenced-to-9-years-in-prison-for-sex-trafficking-of-two-14-year-old-girls/.
[20] *Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14*, The Palm Beach Post (March 31, 2012) https://www.palmbeachpost.com/story/news/crime/2012/02/08/federal-officials-catch-arrest-man/7283405007/
[21] Shereen Siewert, *Sex-trafficking cases hard to crack in Wisconsin*, Post Crescent (March 25, 2014), https://www.postcrescent.com/story/news/2014/03/25/sex-trafficking-cases-hard-to-crack-in-wisconsin/6884671/.
[22] https://patch.com/ohio/lakewood-oh/woman-arrested-for-prostitution-at-days-inn
[23] https://northeasttimes.com/2019/04/02/roosevelt-inn-days-inn-named-in-sex-trafficking-lawsuits/

17

- Three people were arrested in July 2014 in Fayetteville on human trafficking charges after holding a woman captive at a Days Inn.[24]

- In July 2014, three people were arrested and accused of kidnapping and torturing a woman for human trafficking out of a Days Inn in Orange County, CA.[25]

- In September 2014, two Nevada residents were arrested on sex trafficking charges. Officers set up surveillance at a Days Inn in Nashville and "it did not take long for officers to observe heavy foot traffic in and out of that hotel room consistent with a prostitution operation."[26]

- In 2015, a man was charged with trafficking teenage girls after being arrested at a Days Inn in Maryland.[27]

- In April 2015, a Philadelphia man was sentenced for sex trafficking minors. The man worked as a security guard at a Days Inn in Philadelphia and "provided protection and assistance to sex traffickers operating at the motel in exchange for a daily fee."[28]

- In June 2015, two Brooklyn men charged with sex trafficking allegedly forced a teenage girl into prostitution from a Long Island City Days Inn.[29]

- In 2017, arrests were made after it was discovered women were being trafficked out of another Days in Inn Tennessee.[30]

---

[24] Three arrested on human trafficking charges in NC, Fox8 (July 2, 2014), https://myfox8.com/news/three-arrested-on-human-trafficking-charges-in-nc/.

[25] Jeanne Kuang, Three Accused of Kidnapping, Torturing Woman for Human Trafficking in Orange County, NBC Los Angeles (July 30, 2014), https://www.nbclosangeles.com/news/three-accused-of-brutally-kidnapping-torturing-woman-for-human-trafficking-in-orange-county/65718/.

[26] Las Vegas Man, Woman Jailed on Prostitution Charges, City of Franklin, TN (Sept. 5, 2014), https://www.franklintn.gov/Home/Components/News/News/2563/.

[27] https://www.heraldmailmedia.com/story/news/local/2015/07/01/hagerstown-man-charged-with-trafficking-of-two-teenage-girls/45202521/

[28] Philadelphia Man Sentenced for Sex Trafficking Conspiracy, U.S. Attorney's Office (April 9, 2015), https://www.fbi.gov/contact-us/field-offices/philadelphia/news/press-releases/philadelphia-man-sentenced-for-sex-trafficking-conspiracy.

[29] Jackie Strawbridge, *Cuffed Brooklyn Men Allegedly Pimped At LIC Hotel*, licpost (June 9, 2015), https://licpost.com/cuffed-brooklyn-men-allegedly-pimped-at-lic-hotel.

[30] https://www.wgnsradio.com/article/35818/human-trafficking-case-in-murfreesboro

18

59.     These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham branded hotels. Moreover, on information and belief, the Wyndham Brand Defendants are aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

60.     Reviews of Wyndham branded properties, which upon information and belief each of the Wyndham Brand Defendants, monitored regularly, also show the pervasiveness of sex trafficking at its branded properties and the Wyndham Brand Defendants' knowledge of the same. For example:

- A June 2007 Tripadvisor review from a Days Inn in Fresno, CA states "…Which leads me to note the problems with this motel--its location. Because it's close to the 99, and gets a lot of quick travelers up and down the highway, it seems to be the neighborhood to find a prostitute. During our one day stay, we saw at least 4. In the DAYTIME!! And although we weren't bothered by anyone, and the motel itself was quiet, if you've got a family you may want to skip this one."[31]

- A July 2007 Tripadvisor review from a Days Inn in Philadelphia, PA states "This was the worst place I've ever stayed in my life. I've stayed in a lot of Day's Inn that were clean, adequate rooms in a safe neighborhood. As we followed the directions we became apprehensive. When we entered the hotel lobby we knew we had made a mistake when we saw the "bullet proof glass"surrounding the front desk. With our arrival being 4th of July week we felt stuck knowing we could probably not find another room in town at 7 PM. We decided it was better to lock ourselves in a room there than to risk not finding a room elsewhere and having to spend the night in the car. I'll just say that after my one night stay here I'm not sure if I'll ever book Days Inn again! The carpet was soiled. The headboards that were

[31] https://www.tripadvisor.com/Hotel_Review-g32414-d77021-Reviews-Days_Inn_by_Wyndham_Fresno_Central-Fresno_California.html

19

supposed to be bolted to the wall was coming off. We checked out at first light assuming this would be the safest time of day to get out! Prostitutes were hanging around out front and coming in purchasing rooms. Definately not a place for a family!"[32]

- August 2008 Tripadvisor review from a Days Inn in Birmingham, AL states "Saw the website pictures and thought it looked nice and was a good value. So, I booked the room for a week. It was a mistake! It was dirty and had a lot of low life people staying there. Prostitutes, pot heads, and people wandering around all over the place. The pool was a "cess-pool". It stank, and there was a condom wrapper in it. I will NEVER stay there again"[33]

- November 2008 Expedia review from a Days Inn in Nanuet, NY states "The one thing that I will always remember about this hotel was that I had to call the front desk because a very loud and noisey pair of hookers decided to hang out in the hallway next to the exit door (which was unfortunately right near my room) while they waited for a ride to pick them up after their visit to the neighboring hotel room. They were loud and obnoxious after 10 pm while I and my family were trying to sleep. We were on a non-smoking floor and the hookers in the hallway were smoking. When we checked out the next morning we found the hallway littered with their half-eaten pizza slices and crumpled up paper cups. I had to call the front desk to complain about the noise. I don't know if it was a hotel employee or their ride who finally showed up and hustled the call-girls out of the hallway."[34]

- December 2008 Tripadvisor review of a Days Inn in Silver Spring, MD states "This was the worst hotel in my life!" "Both me an my friend are not weedy guys, but we felt unsafe staying there. At around 6pm some black guys kept hovering outside the room, then as it got later some other black guys pulled up in a car outside in the car park and where making lots of noise in there car... then other black guys would go up to the car, and then after a while walk off. Seemed like drug deals where going on in the car park! This is bad because the hotel has absolutely no (ZERO!) security. Members of the public can freely walk in and just go straight to the rooms. It felt very unsafe, so we instantly checked out and made a

[32] https://www.tripadvisor.com/Hotel_Review-g60795-d96684-Reviews-or20-Days_Inn_by_Wyndham_Philadelphia_Roosevelt_Boulevard-Philadelphia_Pennsylvania.html

[33] https://www.tripadvisor.com/Hotel_Review-g30375-d73343-Reviews-Days_Inn_by_Wyndham_Birmingham_West-Birmingham_Alabama.html

[34] https://www.expedia.com/Nyack-Hotels-Days-Inn-By-Wyndham-Nanuet-Spring-Valley.h172075.Hotel-Reviews

quick getaway! Later we found a motel 6 which was a little better but at least safer than this hotel. Other people from the area told us that if the locals notice any foreigners then we could be easy targets and they will watch us. Very unsafe. bullet proof glass in the reception, its basically like being in the bronx run down hotel. It seems that its a very cheap hotel, where the criminals, drug dealers, prostitutes use as its cheap. Dangerous for outsiders or foreigners to use. Not recommended at all. Avoid at all costs."[35]

- February 2009 Tripadvisor review of a Days Inn in Miami, FL states "…got to the hotel, which is in a seedy neighborhood. Walked into the lobby and there were six people in front of us trying to check in. There was a HOOKER working in the lobby. There was one person working plus a security guard. It was taking the receptionist 15 minutes to check in one person. We realized it would be an hour and a half to check in, we'd only get to sleep for 2.5 hours, so we got BACK in the shuttle and slept on the floor of the airport, it was that scary. Don't be fooled."[36]

- July 2010 Tripadvisor review of a Days Inn in Springfield, MO states "Hotel Staff was very friendly, but when we first went into the room there was trash under the bedskirt and a used condom laying by the night stand…Worst of all there were prostitutes staying down below us, I had to go notify staff, she comented that she wonder if that was why she was staying here and the day before we came back to the hotel from watching my son play ball and 2 women were being arrested on the stairs going up to our room. There were several homeless people hanging around the hotel for 3 of the days. I have stayed in Days Inn before and they were nice but I did not feel safe and the experience was bad so I am not sure I will stay again…"[37]

- August 2010 review from Days Inn in Norfolk, VA states "…There were many people drinking on the upper floor. We were told by a passerby that their son was offered services by prostitutes while on the premises. We left right away. Front desk staff said this hotel is safe but front desk staff will note even allow people to walk into the front desk lobby but rather

---

[35] https://www.tripadvisor.co.za/Hotel_Review-g41378-d84007-Reviews-or260-Days_Inn_by_Wyndham_Silver_Spring-Silver_Spring_Montgomery_County_Maryland.html
[36] https://www.tripadvisor.com/Hotel_Review-g34443-d87080-Reviews-Days_Inn_by_Wyndham_Miami_Airport_North-Miami_Springs_Florida.html
[37] https://www.tripadvisor.com/Hotel_Review-g44926-d243908-Reviews-Days_Inn_Suites_by_Wyndham_Springfield_on_I_44-Springfield_Missouri.html

21

communicate with people through a little hole on a confined space area about 4 x 7 room prior to entering the front desk lobby giving people a false sense of security. There were many people drinking on the upper floor and loitering. No security staff to enforce any rules. My family was frightened to stay at this inn."[38] The manager of this hotel responded to it on November 19, 2010.

- September 2010 review of a Days Inn in Milwaukee, WI states "…got back about midnight to find a pair of gentlemen bleeding in the main lobby, i later found out that they were there for a bachelor party and had found a couple "working girls" who took them out and then drugged and beat them, and the their pimp did some stuff i dont even want to repeat, regardless to say, i didnt spend the night, i left at about 3 am, checked into a hotel and absolutely would not recomment this hotel, staff and hotel are nice enough. but the manager and location are just not worth dealing with."[39]

- June 2011 Expedia review of a Days Inn in San Jose, CA states "NOT SAFE PLACE TO STAY OR BRING YOUR FAMILY. Nothing was clean, swimming pool was not usable, there were blood stains on the sheets, no customer service.~~Worst of all, there were drug deals there all the time as well I was propositioned for sex as someone thought I "worked there" Please do not stay here if you want to feel safe"[40]

- January 2012 review from a Days Inn in Lawndale, CA states "… it felt super unsafe lie kinda place that hookers, pimps, gens, & drug dealers frequent. … I would never stay here again. this place is a motel! worth only about $25 a night. its no good unless u just need four walls and bed to sleep in for a night."[41]

- March 2012 review from a Days Inn in New Stanton, PA states "…Sketchy men are inside their truck smoking and hanging out in the parking lot. Men start ogling me and eying me in a creepy, sketchy way and my coach and her husband (both are cops) make a comment about a young woman who is scantly clad and walking with a man in his sixties

[38] https://www.tripadvisor.com/Hotel_Review-g58026-d110777-Reviews-Days_Inn_by_Wyndham_Norfolk_Military_Circle-Norfolk_Virginia.html
[39] https://www.tripadvisor.com/Hotel_Review-g60097-d1571552-Reviews-Days_Inn_Suites_by_Wyndham_Milwaukee-Milwaukee_Wisconsin.html
[40] https://www.expedia.com/San-Jose-Hotels-Days-Inn-By-Wyndham-San-Jose.h18108.Hotel-Reviews
[41] https://www.tripadvisor.ca/Hotel_Review-g32612-d84227-Reviews-Days_Inn_by_Wyndham_Los_Angeles_Lax_Redondo_ManhattanBeach-Lawndale_California.html

22

arm in arm. The son makes a comment that a business transaction was going on and this was a prostitute and a john!" "So, I know that they got rid of my room, because they would rather charge a desperate pervert a higher rate so that he could pay for sex, then an athlete with a lower rate. I argue with the two people at the front desk and get into a shouting match and then five sketchy men stand right near the front desk staring there even after he said that the hotel was booked full…"[42]

- June 2012 review from Das Inn in Atlantic City, NJ states "…when I came back to my hotel I was greeted by to atlantic city prostitutes walking out of the lobby with the european looking fellow. At the lobby the hotel has a $10 per guest policy I suppose as a way of making commissions. Lol. Uuuugh.for the price I paid I should have expected as much and not been as naive but I won't be making that mistake again."[43]

- October 2012 Yelp review of a Days Inn in Sarasota, FL states "Great hotel - if you enjoy being propositioned by prostitutes. Skid row's "finest." A real DUMP."[44]

- January 2013 review from Days Inn in Copiague, NY states "I would not wish this place on my worst enemy. The room smelled like a dead body and they tried to cover it up with Lysol. I let them know that I tried to air the room out for 20 minutes and it did not help. They moved me to the room next door and it was the same thing.
There were all kinds of ghetto trash hanging around my car when I was leaving and the place seemed like a party/hooker hotel based on the people hanging around there."[45]

- January 2013 review of Days Inn in Miami, FL states "Our television didn't work, the walls and tub had stains all over them, and there were hookers and their pimp hanging out waiting for johns on the top floor of the outside rooms overlooking the parking lot. When we complained it was obvious that some of the staff obviously knew what was going on with the prostitution. However the staff we dealt with did try to accomodate us by giving us another room on the inside of the hotel, but it

[42] https://www.yelp.com/biz/days-inn-by-wyndham-new-stanton-pa-new-stanton
[43] https://www.yelp.com/biz/days-inn-by-wyndham-atlantic-city-oceanfront-boardwalk-atlantic-city
[44] https://www.yelp.com/biz/days-inn-by-wyndham-sarasota-bay-sarasota
[45] https://www.tripadvisor.ca/Hotel_Review-g47533-d1176402-Reviews-
Days_Inn_by_Wyndham_Long_Island_Copiague-Copiague_Long_Island_New_York.html

23

was still filthy."[46] A guest relations manager responded to this review on February 4, 2013.

- March 2013 review of a Days Inn in Monroeville, PA states "jenny calderlore (manager) u are failing at making this hotel a success ur neglect and lack of responsibility has turnd me and buisness partners off we will never use this shack again we areas more then the twobit nite people (prostitutes and drug abusers) that use ur facility i will never consider ur hotel again!"[47]

- April 2013 review of a Days Inn in Alexandria, VA states "…Everything is true about the drug activity, prostitutes, across the street is section 8 housing with loud music and lots of "traffic" to one house in particular…Safety is definitely a concern.. I parked my car one night after partying in DC and a bum knocked on my window asking for change. The police have come a few nights driving through the area asking is everything okay. One officer referred to the area as the "problem area"."[48] A guest relations manager responded to this review on April 7, 2013.

- May 2013 review of a Days Inn in Kent, WA states "…During this wait is when we witnessed the worrying stuff. We got the impression that most of the other motel guests lived there. There were guests in and out asking the desk if they had messages who either looked really disheveled or like a prostitute. Some of them knew each other. There was one woman checking in. The employee at the counter told her that if she had any "guests" she would be asked to leave..clearly there was a history. I wrote all this off to my imagination..until a police officer came in. He talked to the staff about their ongoing problems with prostitution and drugs and was offering his help and advice..the staff told him about the people living in their van and car in the parking lot. There were three police cruisers in the parking lot for awhile after that."[49]

- July 2013 review of a Days Inn in Louisville, KY states "I could not believe how bad this place was. The room was nasty, I was afraid to put my 8 month old down! The tub was stained and there were "hairs" in the

---

[46] https://www.tripadvisor.com/Hotel_Review-g34443-d87080-Reviews-Days_Inn_by_Wyndham_Miami_Airport_North-Miami_Springs_Florida.html
[47]
[48] https://www.tripadvisor.co/Hotel_Review-g30226-d83887-Reviews-Days_Inn_by_Wyndham_Alexandria-Alexandria_Virginia.html
[49] https://www.tripadvisor.com/Hotel_Review-g58537-d216846-Reviews-Quality_Inn_Kent-Kent_Washington.html

tub. Not only was the room bad but so was the area..we had prostitutes working from the sidewalk outside our door! We checked out and went to another hotel down the road."[50] The hotel manager responded to this review on July 12, 2013.

- July 2013 review from Days Inn in Corpus Christi, TX states "…I honestly felt that some sort of prostitution was taking place on premises. I can think of no other explanation for the constant activity between midnight and 5:00 a.m. No iron in the room. Hallways smelled like the place had been in a flood. after the first night my son's legs boke out in a rash. The worst hotel experience ive ever had. Definitely not worth $476."[51]

- September 2013 review from a Days Inn in Dallas, TX states "…The hotel is used mainly by prostitutes and drug dealers. It was a last minute decision on my part, due to a change in my work plans. At least I didn't find bed bugs... Wifi only worked in the lobby, false advertising on the hotel's part.... Employees there (front desk clerk and housekeeping) were very unfriendly and not helpful. overall, the worst experience with a hotel, ever. I'm upset that I paid for such crappy service and room."[52] A guest relations manager responded to this review on September 24, 2013.

- January 2014 review from a Days Inn in Beaumont, TX states "Let's see, moldy smell in room? Check. Mildew around tub? Check. Hastily painted over black mold on the wall? Check. Look on my wife's face when a hooker knocks on the door at 2 AM.? Priceless!"[53]

- February 2014 review from a Days Inn in Saint Paul, MN states "…However, when my companions and myself (three women total) went down to the bar for a drink we were propositioned.I had security remove this man. But within a short period of time he was back again harssing us. I did find out from a family member whom we were visitng that this hotel

---

[50] https://www.tripadvisor.com/Hotel_Review-g39604-d295278-Reviews-Days_Inn_by_Wyndham_Louisville_Airport_Fair_and_Expo_Center-Louisville_Kentucky.html

[51] https://www.expedia.com/Corpus-Christi-Hotels-Days-Inn-Suites-By-Wyndham-Corpus-Christi-Central.h43249.Hotel-Reviews

[52] https://www.tripadvisor.co.nz/Hotel_Review-g55711-d109479-r368180294-Days_Inn_Suites_by_Wyndham_Dallas-Dallas_Texas.html

[53] https://www.yelp.com/biz/days-inn-by-wyndham-beaumont-beaumont

25

was busted for a prostitution ring. Well, that was not on the description of the hotel that I read! Had I known this we would have stayed elsewhere."[54]

- April 2014 review of a Days Inn in North Charleston, SC states "…We will NEVER stay here again. The first two nights the people next door argued and yelled half the night. Think a hooker and her pimp because people kept coming in and out all night, ridiculous."[55]

- May 2014 review of a Days Inn in Lanham, MD states "This hotel seems highly trafficked by young adults and/or those using said hotel rooms for sex/prostitution purposes. There was also a lot of screaming and cursing amongst the guests staying at hotel, with very little intervention from night staff."[56]

- July 2014 review of a Days Inn in Columbia, SC states "This place is a dump!! Not a safe place to stay with your family. Hooker's walking around, high speed chase, and drug dealing in front of my room!!! Do Not waste your money!!!"[57]

- July 2014 review of a Days Inn in Savannah, GA states "…Friday night I get woke up by drunk guest in the court yard. 1 am . I go to get something from the car there is 2 prostitutes offering sex for money in the drive way to a group of men getting drunk in the driveway. I decide to get stuff from the vending machines, I couldn't buy a candy bar but you could by condoms…"[58]

- September 2014 review of a Days Inn in Springfield, MO states "Worse hotel ever the room smelt like dirty feet, drug deal in the parking lot. A hooker trying to get my son to come to her room people knocking at your door all hours of the night. Then they took an $101 for charges and told me the room smelt like cigarettes.I dont smoke. So now I'm fighting with

---

[54] https://www.expedia.com/Minneapolis-St-Paul-Hotels-Quality-Inn-St-Paul-Minneapolis-Midway.h20646.Hotel-Reviews

[55] https://www.expedia.com/Charleston-Hotels-Days-Inn-Suites-By-Wyndham-Charleston-Airport-West.h11774.Hotel-Reviews

[56] https://www.tripadvisor.com/Hotel_Review-g41222-d217008-Reviews-Days_Inn_by_Wyndham_Lanham_Washington_D_C-Lanham_Maryland.html

[57] https://www.yelp.com/biz/days-inn-and-suites-by-wyndham-se-columbia-ft-jackson-columbia

[58] https://www.tripadvisor.com/Hotel_Review-g60814-d89795-Reviews-or660-Days_Inn_Suites_by_Wyndham_Savannah_Gateway_I_95_and_204-Savannah_Georgia.html

corporate office to get back my $101."[59] The hotel manager responded to this review on October 20, 2014.

61. The Wyndham Brand Defendants monitored both news stories and online reviews for indicia of criminal activity, including sex trafficking.

62. Upon information and belief, news stories and reviews establish that, at the time Jane Doe A.M.L. was trafficked at the Days Inn, the Wyndham Brand Defendants knew at least the following:

a. The use of its branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem; Commercial sex work occurring at its branded properties involved trafficking and compelled prostitution;

b. Their franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at its hotel properties;

c. Their efforts, if any, to stop facilitating sex trafficking in Wyndham branded properties were not effective; and

d. They were, by their acts and omissions, facilitating sex trafficking at Wyndham branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

63. Despite the continually mounting evidence that sex trafficking at Wyndham branded properties was ongoing and growing, the Wyndham Brand Defendants did not change course. The Wyndham Brand Defendants chose to continue

[59] https://www.tripadvisor.com/Hotel_Review-g44926-d243908-Reviews-Days_Inn_Suites_by_Wyndham_Springfield_on_I_44-Springfield_Missouri.html

27

earning revenue and profits from renting out space in their hotels as a venue for trafficking.

### B. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Days Inn Anaheim West.

64.    The Wyndham Brand Defendants and Franchisees were also specifically aware that sex trafficking was prevalent at the Days Inn Anaheim West.

65.    The Wyndham Brand Defendants and Franchisees knew that the Days Inn Anaheim West was in a high-crime area with a known history of reports of sex trafficking.[60]

66.    It has long been known that hotels in West Anaheim, CA have high levels of human trafficking.[61] In particular, it is known that hotels near Disneyland are hotspots for human trafficking.[62]

67.    The Wyndham Brand Defendants and Franchisees knew that sex trafficking was prevalent at the Days Inn Anaheim West and other Wyndham branded hotels in the immediate area based on online reviews that reflected indicia of sex trafficking and related criminal activity. For example:

---

[60] Prostitution and Human Trafficking: A Paradigm Shift, https://leb.fbi.gov/articles/featured-articles/prostitution-and-human-trafficking-a-paradigm-shift; https://demand-forum.org/site/anaheim-ca/

[61] Beach Boulevard Prostitution: Addressing Human Trafficking in Anaheim, https://popcenter.asu.edu/sites/default/files/12-06f_anaheim.pdf, Human Trafficking in Orange County, https://www.ocregister.com/2014/08/07/human-trafficking-in-orange-county-its-right-in-our-backyard/

[62] 2 Arrested for Running Prostitution Ring Near Disneyland Motel, https://www.cbsnews.com/losangeles/news/2-arrested-for-running-prostitution-ring-near-disneyland-motel/, Sick Sex Trade on Disney's Doorstep https://www.thesun.co.uk/news/1014755/sick-sex-trade-on-disneys-doorstep/

- A 2011 review for the Days Inn Anaheim West was titled "Don't stay here, unless you want to know how cheap prostitutes live," and stated "The Wyndham hotel group should be embarrassed. You should pull the franchise from the owners."[63]

- A 2012 review for the Days Inn Near the Park, located approximately four miles from the Days Inn Anaheim West, noted that "Area of the hotel is RED district. HOOKERS are in the other rooms."[64]

- A 2012 review for a Wyndham branded property located on S. Harbor Blvd, less than three miles from the Days Inn Anaheim West, noted "The fourth night we were there, there was a problem with a prostitute next door to my sisters room. Just as soon as that problem was taken care of, there was YET another prostitute problem in another room. After speaking to one of the staff she informed us that prostitution was a common problem at this location."[65]

- A 2012 review for a Wyndham branded property located on S. Clementine Avenue, less than two miles from the Days Inn Anaheim West, noted "Third, 3 out of the 4 nights we stayed at this hotel a couple and a few individuals staying in a room next to ours violently and physically fought 3 nights in a row for more than an hour outside of our room. The two men had been physically beating a lady and the hotel staff when my spouse and I reported it to the front desk did nothing. I was scared to leave my room or step out in the hallway in fear of the individuals possibly having weapons or guns. We had small children with us and I felt very uneasy about the circumstances. Hotel staff could have cared less. Not cool at all!"[66]

- A 2012 review for a Wyndham branded property located on West Houston Avenue, less than four miles from the Days Inn Anaheim West, noted that "Many of the patrons to this bar we're members of some sort of biker group or gang and were all over the hotel hallways and lobby…. When getting into the elevator again we saw a "couple" we're a guy was escorting

[63] https://www.tripadvisor.com/Hotel_Review-g29092-d78809-Reviews-Days_Inn_by_Wyndham_Anaheim_West-Anaheim_California.html
[64] https://www.tripadvisor.com/ShowUserReviews-g29092-d78938-r156501421-Days_Inn_by_Wyndham_Anaheim_Near_the_Park-Anaheim_California.html
[65] https://www.tripadvisor.com/Hotel_Review-g29092-d75528-Reviews-Ramada_by_Wyndham_Anaheim_Convention_Center-Anaheim_California.html
[66] https://www.tripadvisor.com/Hotel_Review-g29092-d217224-Reviews-La_Quinta_Inn_Suites_by_Wyndham_Anaheim-Anaheim_California.html

29

his "date" back out to her car. She acted like she knew that hotel a little too well, and I'll leave it at that."[67]

- A 2013 review for the Days Inn Near the Park, located approximately four miles from the Days Inn Anaheim West, noted that "My husband solicited by a prostitute at 9 a.m in front of this place. This section of Beach Blvd has been busy with prostitution for years! Especially in the day time, we were told. Even 2 mounted police were patrolling the area (after hooker got picked up). Mgmt says they charge a high rate to hookers/johns to discourage their renting, but who knows?"

- A 2013 review for a Wyndham branded property located on S. Harbor Blvd, less than three miles from the Days Inn Anaheim West, noted "At 1:00 am we were woken to a man yelling "give me back my wallet" and loud banging on the wall. We tried to call the police at 911 but the phone is routed thru the front desk and they would not put the call thru. In fact they refused to answer the phone. Very suspicious! After a while things settled down, we checked out, complained but to no avail. Very scary place to stay, and dangerous. DO NOT STAY HERE!."[68]

- A 2014 review for the Days Inn Anaheim West stated "This was a horrible area. If u like to b around hookers n druggie then this is the hotel for u."[69]

68.    Defendants also knew or should have known that the sex trafficking was pervasive at the Days Inn Anaheim West based on first-hand observations. This activity was continuous and obvious. Hotel staff observed this activity, and, upon information and belief, Defendants observed this activity through on-site employees, security surveillance footage and/or during inspections of the hotel property. Apparent indicia of sex trafficking at the Days Inn Anaheim West included:

[67] https://www.tripadvisor.com/Hotel_Review-g32416-d217217-Reviews-Howard_Johnson_by_Wyndham_Fullerton_Anaheim_Conference_Cntr-Fullerton_California.html
[68] https://www.tripadvisor.com/Hotel_Review-g29092-d75528-Reviews-Ramada_by_Wyndham_Anaheim_Convention_Center-Anaheim_California.html
[69] https://www.tripadvisor.com/Hotel_Review-g29092-d78938-Reviews-or50-Days_Inn_by_Wyndham_Anaheim_Near_the_Park-Anaheim_California.html#REVIEWS

a.    There was a population of traffickers who were known to hotel staff. Communication between the hotel staff and traffickers was friendly and reflected an informal agreement or understanding;

b.    There was a frequent flow of males, who were not guests of the hotel, in and out of rooms after brief stays;

c.    There was a population of regular traffickers who were known to the staff and who routinely made specific requests, such as requesting rooms next to exit doors, requesting adjoining rooms with those being sexually exploited, and requesting to be in the same area of the hotel as other traffickers;

d.    Rooms used by the traffickers were regularly observed to be messy, to contain excessive sex and drug paraphernalia, and to have an unclean smell; and

e.    The trafficking victims had visible tattoos that indicated "branding" by their traffickers.

69.    Traffickers, including Jane Doe A.M.L.'s traffickers, repeatedly chose to use the Days Inn Anaheim West for their sex trafficking activity. Traffickers, including the trafficker of Jane Doe A.M.L., followed a repetitive and routine procedure during stays at the Days Inn Anaheim West through which Defendants knew or should have known of the trafficking activity.

70.    The traffickers, including Jane Doe A.M.L.'s trafficker, operated with little regard for concealment, due to an implicit understanding between the hotel staff of the Days Inn Anaheim West and the traffickers. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

31

71.    The open and apparent nature of this trafficking activity is confirmed by the fact that multiple guests noticed the activity and made reports or complaints about sex trafficking through systems established and monitored by the Wyndham Brand Defendants. Defendants failed to take reasonable steps in response to these reports or complaints.

72.    Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Days Inn Anaheim West prior to Jane Doe A.M.L.'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above.

73.    Upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of the victims, as well as the nature of the victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

74.    All knowledge from the staff at the Days Inn Anaheim West is imputed to Franchisees. Franchisees knew about this widespread and ongoing trafficking at the

32

Days Inn Anaheim West, including the trafficking of Jane Doe A.M.L. through the direct observations of hotel staff, including management-level staff.

75. Upon information and belief, the Wyndham Brand Defendants knew or should have known about the widespread trafficking at the Days Inn Anaheim West, based on:

a. The obligation of hotel staff and Franchisees to report suspected criminal activity, including sex trafficking, to the Wyndham Brand Defendants;

b. The Wyndham Brand Defendants' regular monitoring of online reviews;

c. The Wyndham Brand Defendants' collection and monitoring of customer surveys and complaints;

d. The Wyndham Brand Defendants' requirement that Franchisees submit regular and detailed reports to the Wyndham Brand Defendants about day-to-day hotel operations;

e. The Wyndham Brand Defendants' collection and monitoring of data about guests at the Days Inn Anaheim West, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f. The Wyndham Brand Defendants' supervision and control over day-to-day operations of the Days Inn Anaheim West through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisees to use and through which Franchisees were obligated to allow the Wyndham Brand Defendants to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g. The Wyndham Brand Defendants' regular inspections of the hotel property;

h. The Wyndham Brand Defendants' employment of "field agents" to work with hotels on security issues, including trafficking issues;

33

i. The Wyndham Brand Defendants' access to surveillance and security systems;

j. Information provided to the Wyndham Brand Defendants by law enforcement; and

k. Other sources of information uniquely available to the Wyndham Brand Defendants.

76. Upon information and belief, under the Wyndham Brand Defendants' protocols, which on their face required hotel staff and Franchisees to report suspected criminal activity to the Wyndham Brand Defendants, hotel staff and management were required to report instances of suspected sex trafficking to the Wyndham Brand Defendants prior to Jane Doe A.M.L.'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the Days Inn Anaheim West.

77. Upon information and belief, the Wyndham Brand Defendants observed or were provided notice of obvious "red flags" of numerous instances of sex trafficking occurring at the Days Inn Anaheim West based on its supervision and monitoring of the property.

78. Constructive knowledge of the widespread and ongoing trafficking is imputed to the Wyndham Brand Defendants because, had they acted with ordinary diligence, they would have been aware of this trafficking and that they were benefiting from such trafficking.

C. **Defendants knew or should have known Jane Doe A.M.L. was being trafficked at the Days Inn Anaheim West because of the apparent and obvious "red flags" of Jane Doe's sex trafficking.**

79.    During the time that Jane Doe A.M.L. was trafficked at the Days Inn Anaheim West, it was obvious and apparent she was the victim of sex trafficking.

80.    Some of the obvious signs of Jane Doe A.M.L.'s trafficking at the Days Inn Anaheim West included the fact that at no time was Jane Doe A.M.L. independent or moving of her own volition.  The hotel rooms in which Jane Doe was kept would be paid for in cash or prepaid card, she would not leave the room, she would be in the hotel with a group of girls and an older female/male, she had few or no personal items, the car used to transport her there would be parked in a spot where the license plate was not visible, the do not disturb sign was constantly on the door to the room being used and there was a constant heavy foot traffic in and out of her room involving men who were not hotel guests.  These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

81.    Additionally, hotel staff at the Days Inn interacted directly with  Jane Doe A.M.L.'s traffickers. Hotel staff came to the room, looked in the room and saw evidence of commercial sex and drug use, including numerous used condoms, lubricant, and illicit drugs. Because it was known among the community of traffickers that staff at the Days Inn Anaheim West permitted sex trafficking to occur, Jane Doe A.M.L.'s trafficker made little or no effort to disguise his role or his actions.

35

82. During interactions with the front desk staff at the Days Inn Anaheim West, Jane Doe A.M.L. and her trafficker exhibited obvious and apparent signs of trafficking, including:

    a. Jane Doe A.M.L. did not have access to her identification card, which was controlled by her trafficker.

    b. Jane Doe A.M.L.'s trafficker would pay for rooms with cash or prepaid cards.

    c. Jane Doe A.M.L.'s trafficker smoked marijuana throughout the stay and the odor was obvious to hotel staff.

    d. Jane Doe A.M.L.'s trafficker parked his silver Range Rover in the parking lot, where he frequently hung out.

    e. Jane Doe A.M.L.'s trafficker played loud music to camouflage loud noises coming from the rooms where the trafficking took place. This music also concealed the loud sounds resulting from physical abuse as her trafficker enforced his control through violence. Management of the Day's Inn Anaheim West took no action to investigate the source of the noise or to prevent it from occurring.

    f. Jane Doe A.M.L. and her traffickers would arrive and book a room with little or no luggage with them.

83. While in the common areas of the hotel, Jane Doe A.M.L. exhibited obvious and apparent signs of trafficking that were observed by hotel staff, including:

    a. Jane Doe A.M.L. had limited access to clothing and would be forced to wear clothing that was tattered, inappropriate for the weather, sexually suggestive, and inappropriate for her and age the circumstances;

    b. Jane Doe A.M.L. appeared malnourished and sleep deprived;

    c. Jane Doe A.M.L. had visible bruises;

    d. Jane Doe A.M.L.'s demeanor showed obvious signs of fear and anxiety;

36

e. Jane Doe A.M.L., who was kept in a drugged state by her traffickers, exhibited obvious signs of disorientation and impairment.

f. Jane Doe A.M.L. was frequently yelled at by her trafficker in a way that could be heard by customers and staff;

g. Jane Doe A.M.L.'s trafficker was violent with Jane Doe A.M.L. in public areas of the hotel and on the property surrounding the hotel.

h. Hotel staff saw or heard specific incidents of physical abuse; and

i. Staff received specific complaints or reports about Jane Doe A.M.L.'s trafficker.

84. Hotel staff observed open and apparent signs of activity directly related to the trafficking of Jane Doe A.M.L.:

a. There was constant and heavy foot traffic in and out of Jane Doe A.M.L.'s room involving men who were not hotel guests. Jane Doe A.M.L. had multiple men per day sexually exploiting her at the Days Inn;

b. Men sexually exploiting Jane Doe A.M.L. entered and left her room at unusual times and stayed for brief periods;

c. Jane Doe A.M.L.'s trafficker would often wait in the hallway or visibly pace the parking lot while Jane Doe A.M.L. was engaged in commercial sex work;

d. Men visiting to sexually exploit Jane Doe A.M.L. would enter and exit the hotel in a manner such that they would be seen by staff working at the front desk; and

e. Men visiting to sexually exploit Jane Doe A.M.L. would enter and exit the hotel in a manner such that they would be captured by Defendants' surveillance cameras.

85. Hotel staff observed Jane Doe A.M.L.'s room, which showed obvious and apparent signs of sex trafficking:

a. Jane Doe A.M.L.'s traffickers would decline room services for several consecutive days;

37

b. Jane Does A.M.L.' traffickers would order or require Jane Doe A.M.L. to order excessive additional towels and sheets at varying times of the day or night;

c. Staff would hear sounds of abuse, physical violence, screaming, and crying coming from Jane Doe A.M.L.'s room;

d. Despite loud noise coming from Jane Doe A.M.L.'s room, the staff did not  complain about the noise, inquire about the noise or Jane Doe A.M.L.'s wellbeing , or ask Jane Doe A.M.L.'s trafficker to leave;

e. Jane Doe A.M.L. would be confined to her room for excessively long periods without leaving and would have "Do Not Disturb" signs on her door an unusual amount;

f. Hotel staff would enter Jane Doe A.M.L.'s room to find it littered with used condoms and other sex paraphernalia left behind; and

g. Jane Doe A.M.L.'s traffickers would leave obvious signs of illegal drug use in the room for hotel staff to find.

86.    Multiple employees at the Days Inn Anaheim West, including management level employees, observed and/or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

87.    As such, Franchisees knew or were willfully blind to the fact that Jane Doe A.M.L. was being trafficked at the Days Inn Anaheim West.

88.    While Plaintiff cannot confirm at this point in the litigation and without the benefit of discovery whether a report was actually made to the Wyndham Brand Defendants, the Wyndham Brand Defendants knew or should have known about the trafficking of Jane Doe A.M.L. based on its policy or protocol that **required** hotel staff to report suspected criminal activity including sex trafficking to the Wyndham Brand Defendants.

89.    The Wyndham Brand Defendants also knew or should have known about Jane Doe A.M.L.'s trafficking based on the other methods used to monitor and supervise the Days Inn Anaheim West.[70]

90.    Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham-branded hotels, and at the Days Inn Anaheim West, the Wyndham Brand Defendants and Franchisees each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the subject hotels and to make a reasonable investigation in response to signs of potential sex trafficking. If the Wyndham Brand Defendants and Franchisees had used reasonable prudence, they would have been aware of Jane Doe A.M.L.'s trafficking at the Days Inn Anaheim West and that they were benefiting from such trafficking.

91.    The Wyndham Brand Defendants and Franchisees had both actual and constructive knowledge of the trafficking of Jane Doe A.M.L. at the Days Inn Anaheim West because the trafficking was the direct result of Defendants facilitating her trafficking at the Days Inn Anaheim West.

**IV.    Defendants actively facilitated sex trafficking at the Anaheim West, including the trafficking of Jane Doe A.M.L.**

92.    Despite having actual or constructive knowledge of the widespread trafficking activity at the Days Inn West Anaheim, including the trafficking of Jane

---

[70] *See supra* paragraph 75.

39

Doe A.M.L., Franchisees and the Wyndham Brand Defendants continued to facilitate that trafficking.

### A. Franchisees facilitated the trafficking of Jane Doe A.M.L. at the Days Inn Anaheim West.

93.     Franchisees, including through the staff at the Days Inn Anaheim West, had an opportunity to and did observe obvious signs that there was widespread sex trafficking at the Days Inn Anaheim West and, despite this, allowed this activity to continue unabated.

94.     Franchisees, including through the staff at the Days Inn Anaheim West, had an opportunity to and did observe obvious signs that Jane Doe A.M.L. was being sex trafficked such that Franchisees had actual knowledge that or were reckless in not knowing that Jane Doe A.M.L. was being sex trafficked at the Days Inn Anaheim West. Nonetheless, Franchisees took no steps in response to these signs and, instead, continued providing services to her traffickers.

95.     Based upon information and belief, Franchisees failed to report incidents of commercial sex to police authorities. Whether Franchisee staff or management reported criminal activity at the subject location to the Wyndham Brand Defendants is a fact within the unique possession and control of Defendants. However, Franchisees had a contractual obligation under the franchise agreement to report criminal conduct

including commercial sex, prostitution and/or sex trafficking to the Wyndham Brand Defendants.

96.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Days Inn Anaheim West, Franchisees continued renting rooms to these traffickers used to sexually exploit victims, including Jane Doe A.M.L.

97.    Franchisees knew or were willfully blind to the fact that Jane Doe A.M.L. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe A.M.L.'s sexual exploitation.

98.    Franchisees facilitated Jane Doe A.M.L.'s trafficking at the Days Inn through numerous acts and omission, including:

    a. Franchisees failed to report known or suspected trafficking activity to law enforcement appropriately according to reasonable practices, industry standards, and/or applicable policies;

    b. Despite seeing obvious signs of distress, Franchisees failed to take any steps to inquire about the welfare of Jane Doe A.M.L.

    c. Franchisees continued to rent rooms to traffickers, including Jane Doe A.M.L.'s traffickers, despite known or obvious signs of trafficking;

    d. Franchisees failed to take reasonable steps to hire, train and supervise staff to properly detect and respond to sex trafficking at the Days Inn;

    e. Franchisees enabled traffickers to access ancillary services that supported trafficking activities, such as providing Wi-Fi access they used to advertise commercial sex services, furnishing an unusually large number of sheets and towels to facilitate the commercial sex

acts, and providing disproportionate housekeeping services necessary to clean up the paraphernalia left after the transactions related to commercial sex; and

    f.  Franchisees accommodated specific requests of the traffickers.

99.    By ignoring or remaining willfully blind to obvious signs of trafficking, Franchisees assisted traffickers by providing them a venue, with the cover of a legitimate business, where they could conduct their trafficking activities without having to expend significant efforts to avoid detection or interference.

100.    Franchisees' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe A.M.L.

101.    Franchisee knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**B. The Wyndham Brand Defendants facilitated the trafficking of Jane Doe A.M.L. at the Days Inn Anaheim West.**

102.    At the heart of Defendants' venture with traffickers (including Jane Doe A.M.L.'s traffickers) is the reservation of hotel rooms. Upon information and belief, the Wyndham Brand Defendants retained control over the details of reservations at the Days Inn Anaheim West. The Wyndham Brand Defendants directly participated in and retained day-to-day control over renting rooms at the Days Inn by, among other things:

42

a. controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b. controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification.

c. requiring Franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

d. reserving rooms and accept payments without requiring franchisee approval or involvement;

e. controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation.

f. requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

g. requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

h. requiring the franchisee to use a property-management system operated and controlled by the franchisor;

i. requiring the franchisee to use a data-management system operated and controlled by the franchisor;

j. ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

k. exercising control over the price of rooms;

l. controlling all details of the customer loyalty program that the franchisee was required to implement;

m. setting detailed policies for the check-in process, including requirements for identification and payment methods;

43

    n. collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

    o. assuming sole ownership over all guest information;

    p. overseeing do not rent (DNR) lists for its branded properties.

103. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Days Inn Anaheim West, the Wyndham Brand Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit Jane Doe A.M.L.

104. The Wyndham Brand Defendants knew or, with exercise of ordinary diligence, should have known that Jane Doe A.M.L. was being trafficked and, despite this, financially benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe A.M.L.'s sexual exploitation.

105. The Wyndham Brand Defendants retained control over the details and methods of aspects of the operation of the Days Inn that are directly relevant to the proliferation of sex trafficking at that property. As a result of this retained control and its direct involvement, the Wyndham Brand Defendants participated in a venture with sex traffickers who were using the Days Inn as a venue for their trafficking. Moreover, as a result of this retained control, the Wyndham Brand Defendants had both the opportunity and the duty to prevent Jane Doe A.M.L.'s trafficking. The Wyndham

Brand Defendants directly participated in and retained control over specific aspects of the operation of Days Inn related to trafficking by:

    a.   assuming joint responsibility with Franchisees for detecting and preventing human trafficking at the hotel property;

    b.   assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to law enforcement and the franchisor;

    c.   assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

    d.   assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

    e.   employing field-based associates who work with hotels on trafficking issues;

    f.   assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

    g.   establishing systems for guests to report criminal activity and hotel security issues to franchisor;

    h.   retaining control over the security of the Days Inn Anaheim West through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing customer complaints, and inspecting the Days Inn Anaheim West;

    i.   retaining control over property-specific data and customer data, , including names, payment information, reservation history, browsing data, and other details associated with their stay, from the Days Inn Anaheim West—which they obtained by controlling the means and methods by which Franchisees recorded, stored, and reported that data—such that they had actual or constructive knowledge—about the ongoing trafficking that was occurring at the Days Inn Anaheim West during the time Plaintiff was trafficked there;

45

j.   requiring franchisees to provide Wi-Fi/internet access to guests;

k.   mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

l.   setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

m.   requiring franchisees to use a system to monitor and track housekeeping requests;

n.   setting policies for when and how housekeeping services are provided;

o.   collecting and monitoring data that shows patterns of use of housekeeping services;

106.   Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Days Inn Anaheim West, the Wyndham Brand Defendants continued operating the hotel together with Franchisees in a way that it knew or should have known would result in facilitating additional sex trafficking at Days Inn, including by:

a.   adopting inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking.

b.   providing inadequate training on issues related to human trafficking and unreasonably delaying training.

c.   adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

d. adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

e. adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

f. continuing to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the hotel;

g. affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal;

h. willfully delaying taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner.

i. providing traffickers continued access to Wyndham-maintained internet systems despite having active or constructive knowledge this access was being used for advertising services related to their trafficking activities;

j. adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at subject Days Inn Anaheim West;

k. implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

107.  But for the Wyndham Brand Defendants' failure to exercise ordinary diligence when operating and controlling the Days Inn Anaheim West, including when exercising control over staff training and response to suspected criminal activity on property, they would have known that Jane Doe A.M.L. was being trafficked there. Thus, constructive knowledge of Jane Doe A.M.L.'s trafficking is imputed to the Wyndham Brand Defendants.

108.   If The Wyndham Brand Defendants had exercised reasonable diligence when operating the Days Inn Anaheim West, the Wyndham Brand Defendants would have prevented this hotel from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe A.L.M., and would not have benefited from that trafficking. Instead, the Wyndham Brand Defendants engaged in a course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe A.L.M., resulting in financial benefit to the Wyndham Brand Defendants.

109.   The Wyndham Brand Defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe A.M.L.

110.   The Wyndham Brand Defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

## V.   Defendants Benefited from Ventures at the Days Inn Anaheim West.

111.   Each Defendant directly benefited from facilitating trafficking at the Days Inn Anaheim West. Each Defendant received monetary payment from each room rented at the Days Inn Anaheim West, including the rooms where Jane Doe A.M.L. was being trafficked:

    **a.** Each of the Wyndham Brand Defendants generated substantial income from operations of hotels such as the Days Inn Anaheim West. In exchange for providing the services described above, each of the Wyndham Brand Defendants received a share of the profits from room rentals collected at the Days Inn Anaheim West. The fees generated by the Wyndham Brand Defendants are primarily based on gross room rentals; therefore, the Wyndham Brand Defendants' profits increase with each room rental at the subject Days Inn Anaheim West. Revenue generated from rooms rented at the Days Inn Anaheim West was distributed among the Wyndham Brand Defendants, with each benefiting from each rental of a hotel room.

    **b.** Franchisees profited from every stay by every patron at the Days Inn Anaheim West both from room rentals and other hotel services.

    **c.** By participating in a venture that facilitated sex trafficking, Defendants also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Days Inn Anaheim West specifically.

112. In ways described more fully above, the Wyndham Brand Defendants and Franchisees knowingly received a financial benefit from participating in a venture, in the form of a continuous business relationship and implicit understanding, with sex traffickers (hereinafter "Venture 1").

113. The Wyndham Brand Defendants and Franchisees formed this continuous business relationship and implicit understanding with the traffickers at the Days Inn Anaheim West by continuing to rent rooms to traffickers (including Jane Doe A.M.L.'s traffickers) long after the Wyndham Brand Defendants and Franchisees knew or should have known that the rooms were being used for unlawful trafficking.

49

114.   This implicit understanding developed because sex traffickers, including Jane Doe A.M.L.'s sex traffickers, frequently used the Days Inn Anaheim West for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the Wyndham Brand Defendants and Franchisees that created a favorable environment for sex trafficking to flourish.

115.   Both the Wyndham Brand Defendants and Franchisees participated in this venture by acting jointly to rent rooms to traffickers. Franchisees provided "boots on the ground" for reservations, and the Wyndham Brand Defendants directly participated in renting rooms, retained control over reservation systems, and developed and enforced applicable policies and guidelines as further described in this Complaint. Each Defendant participated in the venture by continuing to rent rooms to Jane Doe A.M.L.'s traffickers long after they knew or should have known that victims like Jane Doe A.M.L. were being subjected to unlawful trafficking.

116.   Defendants did not only provide these traffickers with a physical space (harboring) but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

 a. Jane Doe A.M.L.'s traffickers were familiar to the staff at the Days Inn Anaheim West;

 b. Jane Doe A.M.L.'s traffickers took no steps to conceal their activities from the staff at the Days Inn Anaheim West but, instead, freely made requests that

would facilitate their trafficking activities without concern for detection or interference by that staff;

c. Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

d. Defendants provided additional services to traffickers (including Jane Doe A.M.L.'s traffickers), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

117.   The criminal traffickers operating at the Days Inn Anaheim West as part of Venture 1 violated 18 U.S.C. §1591 as to victims including Jane Doe A.M.L.

118.   Jane Doe A.M.L.'s trafficking at the Day Inn Anaheim West was a result of each Defendant's participation in Venture 1 with the criminal traffickers. If Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe A.M.L.'s trafficking at the Day Inn Anaheim West.

119.   In ways described more fully above, the Wyndham Brand Defendants also knowingly received a financial benefit from participating in a commercial venture with Franchisees operating the Days Inn Anaheim West (hereinafter "Venture 2").

120.   The Wyndham Brand Defendants and Franchisees had a longstanding business relationship pursuant to which they jointly participated in operation of the Days Inn Anaheim West with a shared goal of maximizing revenue, including gross room revenue.

121.   Venture 2 violated the TVRPA through the widespread sex trafficking at the Days Inn Anaheim West, including Jane Doe A.M.L., and through the conduct of Franchisees who violated the TVPRA as perpetrators by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

122.   Despite its actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), Wyndham Brand Defendants participated in the venture by continuing to operate the Days Inn Anaheim West with Franchisees in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe A.M.L. Wyndham Brand Defendants  continued providing Franchisees with operational support, use of its trademarks, marketing services, and other resources to operate the Days Inn Anaheim West in a way that they  knew or should have known was engaging in violations of 18 U.S.C §1591(a).

**VI.    The Relationships among the Wyndham Brand Defendants.**

123.   WHR is responsible, as a successor, for the acts and omissions of its predecessors (including Wyndham Worldwide Corporation and its subsidiaries) with respect to operation, franchising, and control of the Days Inn Anaheim West.

124.   Prior to 2018, an entity known as Wyndham Hotels and Resorts was a private company (referred to herein as "predecessor WHR") that was a wholly owned

subsidiary of Wyndham Worldwide Corporation. In 2018, Wyndham Worldwide Corporation approved a spin-off of its wholly owned subsidiary, predecessor WHR, to form a public company for the continued operation of the Wyndham hotel business that had previously been conducted by Wyndham Worldwide Corporation and/or its wholly owned subsidiaries. This business included the franchising, control, and operation of the Days Inn Anaheim West. This public company that resulted from this spin-off was Defendant WHR.

125.   Defendant WHR and its wholly owned subsidiaries continued to operate all or substantially all the hotel business formerly operated by Wyndham Worldwide Corporation and its subsidiaries, including the franchising, control, and operation of the Days Inn Anaheim West.

126.   Upon information and belief, WHR agreed to assume responsibility for liabilities of Wyndham Worldwide Corporation and its former subsidiaries regarding the franchising, control, and operation of the Days Inn Anaheim West.

127.   Upon information and belief, the rights, and obligations with respect to the operation, franchising, and control of the Days Inn Anaheim West were shared and fulfilled jointly by the Wyndham Brand Defendants. Upon information and belief, each of the Wyndham Brand Defendants shared revenue related to operation, franchising, and control of the Days Inn Anaheim West, and each of the Wyndham Brand Defendants experienced a direct benefit from the rental of rooms to traffickers at the

53

Days Inn Anaheim West. Upon information and belief, each of the Wyndham Brand Defendants participated directly in the ventures franchising, controlling, operating, and renting rooms at the Days Inn Anaheim West in the ways outlined more specifically above. Further, upon information and belief, each of the Wyndham Defendants knew or should have known that these ventures were engaged in facilitation of sex trafficking.

128.   Upon information and belief, each of the Wyndham Brand Defendants participated in a joint venture regarding the operation, control, and franchising of the Days Inn Anaheim West. The Wyndham Brand Defendants, who were corporate affiliates subject to common ownership and control, were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture with respect to the operation, franchising, and control of the Days Inn Anaheim West.

**VII.   Franchisees and the hotel staff at the Days Inn Anaheim West acted as actual agents of the Wyndham Brand Defendants.**

129.   In addition to the Wyndham Brand Defendants' direct involvement in the venture through the means outlined above, the Wyndham Brand Defendants also participated in the venture through the acts and omissions of Franchisees, which are

the Wyndham Brand Defendants' actual agents for the purpose of operating the Days Inn Anaheim West.

130.    The Wyndham Brand Defendants are vicariously liable for the acts, omissions, and knowledge of Franchisees and staff at the Days Inn Anaheim West.

131.    The Wyndham Brand Defendants subjected Franchisees to detailed standards and requirements regarding the operation of the subject Days Inn Anaheim West through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Brand Defendants.

132.    The Wyndham Brand Defendants obscure the full extent of control they exercise over Franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Some of the standards that the Wyndham Brand Defendants imposed on Franchisees:

   a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisees used at the Days Inn Anaheim West;

   b. covered virtually all aspects of hotel operations, including internal operating functions;

   c. dictated the specific way Franchisees and hotel staff must carry out most day-to-day functions at the Days Inn Anaheim West; and

   d. significantly exceeded what was necessary for Wyndham to protect its registered trademarks.

55

133. The Wyndham Brand Defendants' systematic and pervasive control included control over the means and methods of operations that directly caused Jane Doe A.M.L.'s damages.

134. Upon information and belief, the Wyndham Brand Defendants exercised systemic and pervasive control over Franchisees' day-to-day operation of the Days Inn Anaheim West, including the methods and details of Franchisees' work, through ways including:

a. Controlling and requiring franchisees to use a reservation and marketing system;

b. Directly providing marketing services and prohibiting Franchisees from maintaining any online presence unless specifically reviewed and approved by Wyndham;

c. Controlling and requiring franchisees to use a credit process system;

d. Dictating policies regarding forms of payment;

e. Setting prices;

f. Setting wages;

g. Making or influencing employment decisions;

h. Requiring standardized training for hotel employees. Wyndham maintained a team of regionally based trainers to provide training at branded hotels. Wyndham provided training for hotel management and select hotel staff on-site at the Days Inn Anaheim West and through an online learning platform, Wyndham University, that Wyndham controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

i. Requiring Franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations,

including aspects of hotel operations that go significantly beyond what would be necessary for Wyndham to protect its registered trademarks;

j. Retaining sole discretion to determine whether all training has been completed satisfactorily;

k. Requiring Franchisees to participate in mandatory centralized services for day-to-day operation of the hotel;

l. Imposing detailed recordkeeping and reporting requirements on Franchisees regarding virtually all aspects of hotel operations;

m. Establishing detailed job descriptions for all positions in its branded properties and drafting numerous, detailed policies that referenced these positions and dictated which positions must perform which day-to-day tasks at the hotel and how they must do so;

n. Controlling channels for guests to report complaints or provide feedback regarding the Days Inn Anaheim West and directly participating in the response and/or supervising the response to customer complaints or other feedback; and

o. Requiring franchisees to collect guest data using Wyndham' systems, to compile reports, and to make that data available to Wyndham; and

p. Requiring Franchisees  to comply with standards, policies, and rules adopted by Wyndham on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, or other hotel brand related policies published and communicated via property management systems, Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Days Inn.

135. Upon information and belief, the Wyndham Brand Defendants had the right to and actually did enforce their control over Franchisees through various methods including:

a. Detailed and frequent inspections of the Days Inn Anaheim West;

57

b. Monitoring or auditing Franchisees for compliance with policies and expectations;

c. Directing Franchisees to take specific steps to come into compliance with detailed and exacting standards for day-to-day operations;

d. Employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

e. Mandating training and education; and

f. Maintaining the right to terminate the franchise agreement.

136. The Wyndham Brand Defendants are vicariously liable for the acts and omissions of its agents, Franchisees, and any sub-agents or employees of Franchisees with respect to operation of the Days Inn Anaheim West.

137. In addition, both the Wyndham Brand Defendants and Franchisees participated in the venture through the acts and omissions of the staff at the Days Inn Anaheim West because the Wyndham Brand Defendants and Franchisees jointly employ or ratify the employment of staff at the Days Inn Anaheim West.

138. Upon information and belief, the Wyndham Brand Defendants exercised control over the terms and conditions of the terms and conditions of employment by:

a. Posting jobs for its branded properties;

b. Providing benefits to staff of its branded properties;

c. Setting pay, pay parameters, or pay ranges for staff of its branded properties;

d. Setting job qualifications;

e. Setting job descriptions;

f. Dictating staffing levels required at its branded properties;

58

g.  Making or influencing hiring decisions;

h.  Maintaining oversight in disciplining and terminating hotel management and employees;

i.  Providing onboarding and ongoing training; and

j.  Maintaining employment records, including training records.

139.  The Wyndham Brand Defendants and Franchisees act as joint employers because, at the Days Inn Anaheim West, there is a high degree of interrelation of operations and profit sharing.

## CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

140.  Jane Doe A.M.L.  incorporates all previous allegations.

**I.  Cause of Action: Perpetrator Liability under 18 U.S.C §1595(a) Based on Violation of 18 U.S.C §1591(a) (Franchisees).**

141.  Jane Doe A.M.L. is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591 and § 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

142.  Franchisees are perpetrators within the meaning of 18 U.S.C §1595(a) because they:

a.  violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this First Amended Complaint, they harbored individuals (including Jane Doe A.M.L.) at the Days Inn Anaheim West knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at their respective hotel properties.

59

b.  violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this First Amended Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at the Days Inn Anaheim West by trafficking victims, including Jane Doe A.M.L.

143.   Violations of 18 U.S.C §1595(a) by Franchisees as "perpetrators" operated jointly with other unlawful acts and omissions alleged in this First Amended Complaint, to cause Jane Doe A.M.L. to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Days Inn Anaheim West.

**II.    Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).**

144.   Jane Doe A.M.L. is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

145.   All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as further described above, each Defendant knowingly benefitted, by receiving additional revenue and other benefits, from its participation in a venture the Defendants knew or should have known was engaged in a violation of the TVPRA.

146. **Venture 1:** Through acts and omissions more fully described throughout this First Amended Complaint, each Defendant received a financial benefit from participating in Venture 1 with sex traffickers, including Jane Doe A.M.L.'s traffickers. Each Defendant violated the TVPRA through its participation, as a beneficiary, in Venture 1 as follows:

   a. Venture 1 resulted when Defendants developed and maintained a continuous business relationship  and implicit understanding with sex traffickers at the Days Inn Anaheim West by renting them hotel rooms and providing them related services despite the fact that each Defendant knew or should have known these traffickers were using the Days Inn Anaheim West to engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2), including the trafficking of Jane Doe A.M.L.

   b. This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including Jane Doe A.M.L., in the rooms of the Days Inn Anaheim West.

   c. Each Defendant knew or should have known Venture 1 engaged in violations of the TVPRA.

   d. Each member of Venture 1 pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including Jane Doe A.M.L.'s trafficker) rented rooms to earn profits by exploiting trafficking victims (including Jane Doe A.M.L.). Each Defendant received a financial benefit every time a trafficker rented a room.

   e. Each Defendant participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including Jane Doe A.M.L.'s trafficking).

147. **Venture 2**: Through acts and omissions more fully described throughout this First Amended Complaint, the Wyndham Brand Defendants received a financial benefit from participating in Venture 2 with Franchisees operating the Days Inn

Anaheim West. The Wyndham Brand Defendants violated the TVPRA through participation, as a beneficiary, in Venture 2 as follows:

a. Venture 2 is a commercial venture that resulted from the business relationship between the Wyndham Brand Defendants and Franchisees to operate the Days Inn Anaheim West with a common objective of maximizing revenue at the hotel, including gross room revenue.

b. The venture violated the TVPRA through the widespread sex trafficking that occurred at the Days Inn Anaheim West, including the trafficking of Jane Doe A.M.L. This venture also violated the TVPRA through the conduct of Franchisees, who violated 18 U.S.C §1591(a) as perpetrators.

c. Wyndham knew or should have known Venture 2 was engaged in violations of the TVPRA.

d. The Wyndham Brand Defendants knowingly benefited from this venture through the management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the Days Inn Anaheim West, which increased every time a room was rented including rooms rented to traffickers.

e. The Wyndham Brand Defendants participated in this venture by (1) continuing the ongoing business relationship with Franchisees despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel; and (3) continuing to lend the perceived legitimacy of the Wyndham brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

148. The ventures in which each Defendant participated were a direct, producing, and proximate cause of the injuries and damages to Jane Doe A.M.L.

**III.   Cause of Action: Vicarious Liability for TVPRA Violations (the Wyndham Brand Defendants).**

62

149. Jane Doe A.M.L. further alleges that the Wyndham Brand Defendants are vicariously liable for the acts, omissions, and knowledge of Franchisees and the hotel staff while operating the Days Inn Anaheim West.

150. Through the acts and omissions described throughout this First Amended Complaint, the Wyndham Brand Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisees and hotel staff to operate the Days Inn Anaheim West.

151. Franchisees and hotel staff acted as actual agents of the Wyndham Brand Defendants when operating the Days Inn Anaheim West.

152. While acting as actual agents of Wyndham Brand Defendants, Franchisees violated the TVPRA as both beneficiaries and perpetrators.

153. The Wyndham Brand Defendants are vicariously liable for the TVPRA violations of Franchisees.

154. Jane Doe A.M.L. further alleges that the Wyndham Brand Defendants are vicariously liable for the acts and omissions of the staff at the Days Inn Anaheim West as a joint employer. In the ways described throughout this First Amended Complaint, the Wyndham Brand Defendants and Franchisees jointly controlled the terms and conditions of their employment. As a result, Wyndham and Franchisees are the joint employer of the hotel staff.

155. Each of the Wyndham Brand Defendants is liable for the acts and omissions of each of the other Wyndham Brand Defendants with respect to the operation and franchising of the Days Inn Anaheim West. On information and belief, the Wyndham Brand Defendants, who were corporate affiliates subject to common ownership and control and who shared employees and a single corporate headquarters, operated as a joint venture engaged in profit sharing and subject to mutual control regarding the operation of the Days Inn Anaheim West. They operated as a single integrated enterprise and as alter-egos and/or agents of one another with respect to operation of the Days Inn Anaheim West.

**DAMAGES**

156. Defendants' acts and omissions, individually and collectively, caused Jane Doe A.M.L. to sustain legal damages.

157. Defendants are joint and severally liable for all past and future damages sustained by Jane Doe A.M.L.

158. Jane Doe A.M.L. is entitled to be compensated for personal injuries and economic damages, including:

   a. Actual damages (until trial and in the future);

   b. Incidental and consequential damages (until trial and in the future);

   c. Mental anguish and emotional distress damages (until trial and in the future);

64

d.  Lost earnings and lost earning capacity (until trial and in the future);

e.  Necessary medical expenses (until trial and in the future);

f.  Life care expenses (until trial and in the future);

g.  Physical pain and suffering (until trial and in the future);

h.  Physical impairment (until trial and in the future);

i.  Exemplary/Punitive damages;

j.  Attorneys' fees; and

k.  Costs of this action.

l.  Pre-judgment and all other interest recoverable.

## DISCOVERY RULE

159.   To the extent Defendants assert an affirmative defense of limitations, Jane Doe A.M.L. invokes the discovery rule. The nature of sex trafficking inherently conceals the act of trafficking itself with respect to the victim.  At the time Jane Doe A.M.L. was trafficked, Jane Doe A.M.L. did not know that she was the victim of human trafficking and as a result could not knowthat her injury arose from being trafficked. Jane Doe A.M.L. was not in a position to discover the legal cause of her injury.

## JURY TRIAL

160.   Jane Doe A.M.L. demands a jury trial on all issues.

## RELIEF SOUGHT

Wherefore, Jane Doe A.M.L. respectfully requests judgment against Defendants, jointly and severally, for actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law, costs of suit, attorney fees, and all other relief, at law or in equity, to which she may be justly entitled.

Dated: December 13, 2023

Respectfully submitted,

By: /s/Moze Cowper
C. Moze Cowper (Bar No. 326614)
**COWPER LAW PC**
12301 Wilshire Boulevard, Suite 303
Los Angeles, California 90025
Tel.: (877) 529-3707
mcowper@cowperlaw.com

Patrick Barrett (*pro hac vice*)
**PROVOST UMPHREY LAW FIRM**
4205 Hillsboro Pike, Suite 303
Nashville, Tennessee 37215
Tel.: (615) 297-1932
pbarrett@pulf.com

Bryan O. Blevins (*pro hac vice*)
**PROVOST UMPHREY LAW FIRM**
350 Pine Street, Suite 1100
Beaumont, Texas 77701
Tel.: (409) 838-8858
Fax: (409) 813-8610
bblevins@pulf.com

Edward Fisher (*pro hac vice*)
**PROVOST UMPHREY LAW FIRM**
350 Pine Street, Suite 1100
Beaumont, Texas 77701
Tel.: (409) 838-8859
Fax: (409) 813-8682

66

efisher@pulf.com

Annie McAdams (pro hac vice)
**ANNIE MCADAMS PC**
2200 Post Oak, Suite 1000
11th Floor, PNC Tower
Houston, Texas 77056
Tel.: (713) 785-6262
Fax: (866) 713-6141
annie@mcadamspc.com

*Attorneys for Plaintiff*

67